# FLORIDA ET AL. *v.* LONG ET AL.

No. 86–1685.   Argued February 22, 1988—Decided June 22, 1988

224

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 240. STEVENS, J., filed a dissenting opinion, *post*, p. 247.

*Charles T. Collette* argued the cause for petitioners. With him on the briefs was *Bruce A. Minnick.*

*Woodrow M. Melvin, Jr.,* argued the cause for respondents. With him on the brief were *David Popper* and *Keith Olin.* Respondent *David V. Kerns* filed a brief *pro se.**

JUSTICE KENNEDY delivered the opinion of the Court.

The questions presented for decision here are the date upon which pension funds covered by Title VII of the Civil Rights Act of 1964 were required to offer benefit structures that did not discriminate on the basis of sex and whether persons who retired before that date are entitled to adjusted benefits to eliminate any sex discrimination for all future benefit payments. We revisit our decisions in *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702 (1978), and *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073 (1983).

The issues before us turn on whether *Manhart's* invalidation of discriminatory contributions necessarily apprised employers that plans which were nondiscriminatory as to contributions must in every case be nondiscriminatory as to

*\*Robert E. Williams, Douglas S. McDowell,* and *Garen E. Dodge* filed a brief for the Equal Employment Advisory Council et al. as *amici curiae* urging reversal.

benefits. We conclude that *Manhart* neither resolved the issue nor gave employers notice that benefits necessarily were embraced by the decision. The point was not resolved in a definitive way until our decision in *Norris*. We hold further that employees who retired before the effective date of *Norris* are not entitled to a readjusted benefits payment structure.

## I

Since 1970, the State of Florida has operated the Florida Retirement System (Florida System) for state employees and employees of over 1,100 participating local governments. Fla. Stat. § 121.011 *et seq.* (1987). The Florida System is a defined benefit pension plan, which guarantees retirement benefits that may not be lowered once the employee retires and selects a pension option. The Florida System's normal retirement benefit is a single life plan with monthly payments for the employee's life, calculated as a percentage of the employee's average highest salary upon retirement. § 121.091 (1). Upon retirement, an employee also may select a pension plan from one of three retirement options: (1) a joint and survivorship option providing monthly payments for the retiree's lifetime and, in the event of the retiree's death within 10 years after retirement, the same monthly payments to the beneficiary for the balance of the 10-year period; (2) a joint annuitant option ensuring monthly benefits for the lives of the retiree and his beneficiary; and (3) a joint annuitant option providing monthly payments for the lives of the retiree and his beneficiary, but reducing by one third, upon the death of either, the monthly benefits to the surviving individual. § 121.091(6).

The state legislature periodically reviews the Florida System's finances and operation, and determines the appropriate contribution rates for government employers as a percentage of the gross compensation of participating employees. Fla. Stat. §§ 121.031, 121.061, 121.071 (1987). The State Constitution requires Florida to collect contributions sufficient

to fund the System on a "sound actuarial basis." See Fla. Const., Art. X, § 14. The Florida System was funded originally by employer and employee contributions; but, since 1975, the System has been funded entirely by contributions from state and local government employers. Contributions for male and female employees with the same length of service, age, and salary always have been equal. The normal, or single life, plan, moreover, has provided equal monthly benefits to similarly situated male and female employees since the inception of the Florida System. Only the payment structure under the three joint options is in dispute here.

Florida calculates an employee's normal retirement benefit as a product of two variables, with the first variable a statutorily determined percentage of the employee's average monthly compensation upon retirement and the second variable the employee's credited years of employment. Fla. Stat. §§ 121.091(1)(a),(b) (1987). The normal retirement benefit is therefore equal for similarly situated male and female employees. If a retiring employee selects one of the optional joint annuitant plans instead of the normal plan, the Florida System then uses a third variable, the retiree's life expectancy, to determine the present actuarial value of his or her normal retirement benefit. § 121.091(6)(b). Until our *Norris* decision, Florida calculated a retiree's life expectancy using sex-based actuarial tables. As the male's life expectancy was less than a female's, so too was the actuarial value of his normal retirement benefit; and, because the optional plans operated by a presumed exchange of the normal benefit for an optional plan, the lower actuarial value of the male benefit caused the male retiree to receive a joint annuitant benefit with lower monthly payments.

Immediately after our decision in *Norris*, Florida acted to adopt unisex actuarial tables for all employees in the Florida System retiring after August 1, 1983. Under the unisex tables, male and female retirees similarly situated receive equal monthly pension benefits under any of the offered

plans. As a result, Florida's current retirement plans create no distinction, either in contributions or in payments, between employees or between post-*Norris* retirees on the basis of sex.

## II

Retirees Hughlan Long and S. Dewey Haas brought this suit in the United States District Court for the Northern District of Florida against Florida and various of its officials with responsibility for management of the Florida System. They alleged that petitioners were violating Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, by operating pension plans that discriminated on the basis of sex, and requested the District Court to certify a class action under Federal Rule of Civil Procedure 23. Retirees requested retroactive compensation for underpayment of pension benefits.

On January 20, 1983, the District Court approved respondents' class action, certifying a class consisting of male retirees who elected one of the optional plans and who retired after March 24, 1972,[1] and before August 1, 1983. After an orderly progress to the merits, the District Court entered summary judgment in respondents' favor, holding that Florida's optional pension plans discriminated against male employees in violation of Title VII. The District Court determined that the effective date of our decision in *Manhart* was October 1, 1978. It awarded relief to class members who retired after that date and before August 1, 1983, by retroactive "topping up"[2] of the monthly retirement benefits to Florida's current

---

[1] March 24, 1972, is the effective date of the Equal Employment Opportunity Act of 1972, which, for the first time, made public employers like Florida and its local governments an "employer" within the meaning of Title VII. 86 Stat. 103. See 42 U. S. C. § 2000e. We do not determine whether this is the appropriate date for public employers' liability under Title VII.

[2] "Topping up" compensates for the difference between the benefits male retirees did receive and the benefits they would have received if the Florida System had used unisex mortality tables, but would not provide

unisex levels. The topping up was awarded for the period from October 1, 1978, to April 30, 1986, the date of the District Court's judgment for purposes of damages calculation. It also awarded all class members topped-up future monthly benefits, commencing on the date of its judgment.

The Court of Appeals for the Eleventh Circuit affirmed. 805 F. 2d 1542, rehearing denied, 805 F. 2d 1552 (1986) *(per curiam)*. It held, in sum, that our decision in *Manhart* had placed employers on notice that pension benefits, not just contributions, must be calculated without reliance on sex-based actuarial tables. *Id.*, at 1547–1548, 1551. We granted certiorari, 484 U. S. 814 (1987), to consider these issues, and we reverse.

III

Two aspects of retroactivity analysis are presented by this case. The first is whether *Manhart* or *Norris* establishes the appropriate date for commencing liability for employer-operated pension plans that offered discriminatory payment options. We discuss below the retroactivity principles already explored in the pension cases and determine that *Norris* is the controlling liability date and that liability may not be imposed for pre-*Norris* conduct. The second question concerns the proper implementation of our nonretroactivity determination. This requires us to determine whether benefit adjustments ordered by the District Court should be classified as retroactive or prospective. We hold the adjustments are retroactive and that pre-*Norris* retirees are not entitled to adjusted benefits for the violations claimed here.[3]

---

male retirees with benefits equal to those female retirees received under the sex-based tables. App. to Pet. for Cert. A65. See *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 719–720, n. 36 (1978) (full equalization "may give the victims of the discrimination more than their due").

[3] The parties raise other issues regarding whether 42 U. S. C. § 2000e-5(g) limits petitioners' liability for retroactive compensation to no more than two years prior to the filing of a proper Equal Employment Opportunity Commission (EEOC) charge of discrimination and whether 42 U. S. C.

## A

We have identified three criteria for determining whether retroactive awards are appropriate in Title VII pension cases involving the use of sex-based actuarial tables. *Manhart*, 435 U. S., at 719–723; *Norris*, 463 U. S., at 1105–1107; *id.*, at 1109–1111 (O'CONNOR, J., concurring). See also *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 105–109 (1971). The first is to examine whether the decision established a new principle of law, focusing, in this context, on whether *Manhart* clearly defined the employer's obligations under Title VII with respect to benefits payments. The second criterion is to test whether retroactive awards are necessary to the operation of Title VII principles by acting to deter deliberate violations or grudging compliance. The third is to ask whether retroactive liability will produce inequitable results for the States, employers, retirees, and pension funds affected by our decision.

The first criterion, the extent to which new principles of law have been established, is of particular significance to our holding today. The Court of Appeals held that *Manhart* placed Florida on notice that optional pension plans offering sex-based benefits violated Title VII, and it awarded retroactive relief accordingly. We disagree. The pension plan provision at issue in *Manhart* was the "requirement that men and women make unequal contributions to an employer-operated pension fund." 435 U. S., at 717. While the language of our decision may have suggested the potential application of Title VII to unequal payments, we were careful

---

§ 2000e-5(e) requires that the plaintiff class be restricted to include only those individuals who retired no more than 300 days prior to the filing of such an EEOC charge. We do not address these issues because, in either case, the relevant liability limitations would be prior to our decision in *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073 (1983), which sets the controlling date for liability.

to state that we did not reach that issue. We limited our holding to unequal contributions.

We recognized that "[t]here can be no doubt that the prohibition against sex-differentiated employee contributions represents a marked departure from past practice." *Id.*, at 722. Our decision stated two principal limits on the potential liability of employer-operated pension plans. First, we limited the holding to the fact pattern then before us. We stated:

> "Although we conclude that the Department's practice [of requiring discriminatory pension contributions on the basis of sex] violated Title VII, we do not suggest that the statute was intended to revolutionize the insurance and pension industries. All that is at issue today is a requirement that men and women make unequal contributions to an employer-operated pension fund." *Id.*, at 717.

Second, we confined the reach of our decision by recognizing the potential for interaction between an employer-operated pension plan and pension plans available in the marketplace. We said:

> "Nothing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market." *Id.*, at 717–718.

Our references to contributions, as distinct from benefits payments, and our recognition of open market forces limited the decision and left some doubt regarding its command. Ensuing decisions expressed conflicting views of *Manhart*'s reach.[4] Commentators also expressed conflicting opinions

---

[4] Compare *Peters* v. *Wayne State University*, 691 F. 2d 235 (CA6 1982) (use of sex-based tables does not violate Title VII if actuarial value of pension plans for similarly situated males and females is equal), and *EEOC* v. *Colby College*, 589 F. 2d 1139, 1146 (CA1 1978) (Coffin, J., concurring)

regarding the permissible and appropriate scope of the decision.[5]

Not until *Norris*, decided five years after *Manhart*, did we address the matter of unequal benefits payments and the open market exception. *Norris* extended the principle of nondiscrimination to unequal benefits, stating that "the classification of employees on the basis of sex is no more per-

---

(*Manhart* does not necessarily preclude pension system that offers employees equal benefit plans as well as optional "actuarially sound" plans, with unequal benefits, based on sex-based tables), with *Spirt* v. *Teachers Insurance and Annuity Assn.*, 691 F. 2d 1054 (CA2 1982) (unequal benefits as well as unequal contributions barred under *Manhart*), vacated and remanded, 463 U. S. 1223 (1983), and *Sobel* v. *Yeshiva University*, 566 F. Supp. 1166, 1192 (SDNY 1983) (following *Spirt* as binding Circuit law, but noting that the Court's decision to review *Norris* should end uncertainty regarding "[w]hether the Supreme Court will retreat from its *Manhart* holding or offer some reasonable means of applying it in a nondiscriminatory fashion . . . [and] the Court is almost certain to comment upon several types of distribution options which have been offered to avoid a *Manhart* problem" (footnote omitted)), rev'd and remanded, 797 F. 2d 1478 (CA2 1986), later decision, 656 F. Supp. 587 (SDNY 1987).

[5] Compare Jacobs, The *Manhart* Case: Sex-Based Differentials and the Application of Title VII to Pensions, 31 Lab. L. J. 232, 237–238, 244 (1980) (noting that "should the majority have intended the plain meaning of its words, the decision in *Manhart* will not invalidate gender-based mortality tables and pension benefits"), and Kistler & Healy, Sex Discrimination in Pension Plans since *Manhart*, 32 Lab. L. J. 229 (noting that lower court decisions after *Manhart* "resolved the uncertainty" by extending *Manhart* to "prohibit the payment of sex-based pension benefits as well as the unequal contributions procedure originally proscribed"), with Kimball, Reverse Sex Discrimination: *Manhart*, 1979 Am. Bar Found. Research J. 83, 91–92, 138 (noting expansion of *Manhart* "far beyond what the Court said or even hinted," and concluding that the effect of *Manhart* should be limited to unequal contribution requirement imposed on employees in employer-operated pension.plans), and Note, *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris:* Mandate of *Manhart*, 86 W. Va. L. Rev. 437, 452 (1983–1984) (*Manhart* significant "for what it did not do. . . . *Manhart* did not reach beyond 'men and women making unequal contributions to an employer-operated pension fund'").

missible at the pay-out stage of a retirement plan than at the pay-in stage." *Norris*, 463 U. S., at 1081. It also addressed uncertainty over the open market exception and responded to discrete issues not raised in *Manhart*. Granting only narrow operation to the open market exception, we excluded from it employer-operated pension plans which offered annuities that duplicated those available from private companies. 463 U. S., at 1087–1088. *Norris* also condemned pension plans offering male and female employee annuities with "the same present actuarial value" where sex-based differentials resulted. *Id.*, at 1082–1083. Pension funds which offered nondiscriminatory plans with alternative discriminatory options were also held in noncompliance with Title VII's requirements. *Id.*, at 1081–1082, and n. 10. Thus, some questions left open by *Manhart* were answered in *Norris*. Our close division in the later case, however, suggests that application of the earlier law to differential benefits was far from obvious.

In view of the substantial departure from existing practice that *Manhart* ordered, pension fund administrators could rely with reasonable assurance on its express qualifications and conclude that it was confined to cases of sex-based contributions. A few months before our decision in *Norris*, the United States Department of Labor completed a study of pension plans and the financial impact of an Equal Employment Opportunity Commission proposal to adopt an equal benefits rule. United States Dept. of Labor, Cost Study of the Impact of an Equal Benefits Rule on Pension Benefits (Jan. 1983) (hereinafter Cost Study). The Cost Study found that "[s]ubstantial percentages of both [defined benefit and defined contribution] types of pension plans follow the customary insurance industry practice of using sex-segregated mortality tables in calculating annuity benefits." *Id.*, at 2. It estimated that 45% of the participants in defined benefit plans like the Florida System and 74% of the participants in

defined contribution plans continued to receive benefits cal-
culated with sex-based tables.    *Ibid.*

The Florida experience further illustrates the difficulty of
determining the requirements for full compliance.    Since its
inception, the Florida System not only required equal con-
tributions for male and female employees but also provided a
primary single life benefit with equal payments to similarly
situated male and female employees.    The primary single life
benefit is of particular significance, for it complied with both
*Norris* and *Manhart.*    See Cost Study 11–12; Hager & Zim-
pleman, The *Norris* Decision, Its Implications and Applica-
tion, 32 Drake L. Rev. 913, 938 (1982–1983) (*Norris* decision
will "have little effect upon defined benefit plans so far as the
normal form pension benefit is concerned . . . [since that ben-
efit] already pays equal annuity incomes").

The provision of optional annuity plans in the Florida Sys-
tem provided employees with a range of choices for their con-
venience.    Before *Norris*, Florida could conclude reasonably
that, once employees were offered a unisex primary benefit,
*Manhart* did not prevent the offering of sex-based annuities
as options.    The alternative for employers who wished to
control, or were unable to finance, the costs of unisex options
would be to eliminate optional benefits entirely and offer the
primary benefit alone.    See Hager & Zimpleman, 32 Drake
L. Rev., at 938–939.    Employees do not benefit from the re-
duction of their pension plan options, and Florida may have
assumed we did not intend to eliminate an employee's flex-
ibility in choosing a retirement option, so long as the options
presented included a sex-neutral benefit.

In *Norris* itself we recognized that *Manhart* had reserved
the determination of some major issues.    While we narrowed
the open market exception to include only pension plans
where employers set aside an equal lump-sum payment and
the individual employee purchased an annuity from a private
pension company, 463 U. S., at 1088, we recognized that em-
ployers "reasonably could have assumed that it would be law-

ful to make available to its employees annuities offered by insurance companies on the open market." *Id.*, at 1106. The pension plan we considered in *Norris* reflected a reasonable application of the open market exception. While the forms of the Florida System's plans and those considered in *Norris* may differ, they are the same in economic substance.

Florida's continuance of the optional plans until the *Norris* decision does not justify imposition of a retroactive award. We note, moreover, that while Florida's offer of the non-discriminatory benefit makes its case against retroactivity more compelling, this particular feature is not essential to establish that *Norris* is the effective date for conforming benefit structures. The considerations discussed below are also of relevance.

The second and third criteria of retroactivity analysis also support our determination that *Norris*, and not *Manhart*, provides the appropriate date for determining liability and relief. In the pension context, we have considered whether retroactive awards are necessary to further the purposes of Title VII and to ensure compliance with our decisions, and we have concluded that retroactivity is not required. *Manhart*, 435 U. S., at 720–721; *Norris*, *supra*, at 1110 (O'CONNOR, J., concurring). We see no reason to depart from that conclusion in the case before us. Florida acted immediately after our decision in *Norris* and modified its optional pension plans to provide equal monthly benefits to each individual employee who retired after August 1, 1983. There is no evidence that employers in general have not complied with the Title VII requirements we announced in *Manhart* and extended in *Norris*.

Finally, we conclude here, as in *Manhart* and *Norris*, that the imposition of retroactive liability on the States, local governments, and other employers that offered sex-based pension plans to their employees is inequitable. The effect of "drastic changes in the legal rules governing pension and insurance funds" on the provision of reserves for unexpected

benefits; the complexities of pension funding in an industry that had once relied on sex-based tables, coupled with the lack of authoritative guidance from the courts or administrative agencies; the potential instability in pension and retirement programs and the resulting harm to other retirees as innocent third parties; and the absence of any reason to believe that "the threat of a backpay award" was necessary to effect pension fund compliance with our decision, all compelled our conclusion in *Manhart* that "the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result." *Manhart, supra*, at 720–723. Noting that Congress had, in fact, stressed the importance of "making only gradual and prospective changes" in the legal rules governing pension plans, 435 U. S., at 721–722, n. 40, we concluded, in general terms, that the "*Albemarle* presumption in favor of retroactive relief" should not be applied to this type of Title VII pension plan suit. *Id.*, at 723. See *Albemarle Paper Co. v. Moody*, 422 U. S. 405, 421 (1975).

In *Norris*, we reaffirmed our conclusion that retroactive liability was inappropriate in Title VII pension plan cases. 463 U. S., at 1105–1107. Retroactive awards, applied to every employer-operated pension plan that did not anticipate our decision, would impose financial costs that would threaten the security of both the funds and their benefici-aries. *Id.*, at 1110 (O'CONNOR, J., concurring); *id.*, at 1094–1095 (MARSHALL, J., concurring in judgment in part). See also Buck Research Corporation, Trends in Corporate Pension Benefits: Unisex Before and After *Norris* 15 (Oct. 1983) (survey of Fortune 500 industrial corporations showing only 39.8% used unisex tables for their pension annuities when *Norris* was decided).

Respondents argue that Florida's pension administrators had "actual notice from internal memoranda and discussions" that the continuation of the sex-based optional pension plans after *Manhart* violated Title VII. 805 F. 2d, at 1550. Simi-

larly, respondents argue that the Florida System can in fact afford the District Court's $43 million award. Our power to order appropriate relief under Title VII is equitable in nature and flexible, *Manhart, supra,* at 718–719; see 42 U. S. C. §2000e-5(g), but the particular circumstances of a case are not the sole determinant of relief. That Florida's fund currently may possess a surplus or that Florida's administrators discussed early intimations of later doctrine should not control a decision that must be based on a broad principle. 435 U. S., at 722, n. 42. We will not adopt the premise that the appropriateness of a retroactive award turns on a particular pension fund's current financial status, so that financially successful pension funds pay but financially insecure pension funds do not. To do so imposes a penalty for prudent management. Similarly, the question whether *Manhart* placed employers on notice of Title VII's requirements cannot turn on the internal debates of one pension fund's administrators. The meaning and scope of a decision do not rest on the subjective interpretations of discrete, affected persons and their legal advisers. We have previously noted that "[i]mportant national goals would be frustrated by a regime of discretion that 'produce[d] different results for breaches of duty in situations that cannot be differentiated in policy.'" *Albemarle Paper, supra,* at 417 (citing *Moragne* v. *States Marine Lines,* 398 U. S. 375, 405 (1970)).

While we hold that *Manhart* did not establish the date for Florida to conform its payment options to unisex standards, we do not hesitate to say that *Norris* did so. If Florida had continued to use sex-based actuarial tables to calculate benefits for its pension plans after *Norris,* the case before us would have been an altogether different one. *Norris* informed covered employers with pension plans of the obligation under Title VII to provide payment levels, both for contributions and for benefits, that are nondiscriminatory as to sex. We conclude that the effective date of our decision in

*Norris* provides the appropriate limit on retroactive liability in this case.

### B

We next consider implementation of our nonretroactivity determination. The District Court made two separate awards. The first, for back compensatory payments to employees who retired after *Manhart* and before *Norris* and covering the entire period from *Manhart* to the date of its judgment, is retroactive without doubt and is, by our decision here, impermissible. The second award required that payments after judgment be adjusted for all pre-*Norris* male retirees who are receiving lower benefits. The District Court, and the Court of Appeals in affirming, labeled this latter award prospective relief. We disagree.

The distinction between retroactive and prospective relief is not always self-evident. An order requiring adjusted future payments for pre-*Norris* retirees may contain the essential elements of a retroactive order. Unlike an ordinary injunction against future conduct, the effect of an order that increases pension benefits to employees who have already retired may be retroactive in a fundamental sense if it corrects a fixed calculation based on assumptions that both the State and the retiree held when the retirement occurred. Benefits are altered despite the circumstance that past contributions were keyed to lower benefit payments, which undermines the basic financial calculus of a pension plan that determines contribution rates to support a predicted level of payments. See *Norris*, 463 U. S., at 1092 (MARSHALL, J., concurring in judgment in part). Such changes in benefits based on past contributions and actuarial assumptions may create a deficiency in the pension fund, requiring additional funds from the State and other employers to meet the increased benefits liability or forcing the pension plan to violate its contractual benefit guarantee to other retirees. In sum, an award in many cases may be retroactive in nature "[w]hen a court di-

rects a change in benefits based on contributions made before the court's order." *Ibid.;* see *id.,* at 1105, n. 10.

It is not correct to consider payments of benefits based on a retirement that has already occurred as a sort of continuing violation. Our decision in *Bazemore* v. *Friday,* 478 U. S. 385 (1986), is not to the contrary. *Bazemore* concerned the continuing payment of discriminatory wages based on employer practices prior to Title VII. In a salary case, however, each week's paycheck is compensation for work presently performed and completed by an employee. Further, the employer does not fund its payroll on an actuarial basis. By contrast, a pension plan, funded on an actuarial basis, provides benefits fixed under a contract between the employer and retiree based on a past assessment of an employee's expected years of service, date of retirement, average final salary, and years of projected benefits. In the pension fund context, a continuing violation principle in every case would render employers liable for all past conduct, regardless of whether the liability principle was first announced by *Manhart, Norris,* or our decision here. We cannot recognize a principle of equitable relief that ignores the essential assumptions of an actuarially funded pension plan.

We applied these principles in *Norris* and held that an order to adjust future annuity payments to female retirees to reach equality with payments to similarly situated men was "fundamentally retroactive in nature." 463 U. S., at 1105, n. 10. The District Court's award here is indistinguishable in principle from the one found retroactive in *Norris.* The State of Florida determined contribution rates by relying on a precise assessment of expected future pension benefits for covered state and local government employees. The Constitution of the State of Florida mandated that the fund be maintained on a sound actuarial basis. Fla. Const., Art. X, § 14. As Florida guarantees the level of benefits, the District Court's award affects the pension fund's ability to meet its accrued obligations.

A different case, and a different assessment of retroactivity, might result under pension plan structures which do not provide retirees with a contractual right to a fixed level of benefits or rate of return on contributions. See *Spirt* v. *Teachers Insurance & Annuity Assn.*, 735 F. 2d 23, 28 (CA2 1984). There, an award for future increase may require neither additional funding by the State or employer nor violation of contractual rights of other retirees. That is not the case before us, however. It is essentially retroactive to disrupt past pension funding assumptions by requiring further adjustments based on conduct that could not reasonably have been considered violative of Title VII at the time retirements occurred and funding provisions were made. Respondents "could not have done anything after *[Norris]* to eliminate [the resulting disparity in the pension fund] short of expending state funds." *Norris, supra,* at 1095 (MARSHALL, J., concurring in judgment in part).

Under the Florida plan, no adjustment in benefits payments is required for employees who retired before the effective date of our decision in *Norris*. As the class here consists only of employees who retired before *Norris*, it is not entitled to the relief ordered by the District Court.

The judgment of the Court of Appeals for the Eleventh Circuit is reversed.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

The Court's decision today denies respondents retroactive relief on the ground that equitable considerations prevent imposition of liability for Florida's actions taken prior to the effective date of our decision in *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073 (1983). Because I conclude that the same equitable considerations mandate retroactive liability for Florida's Title VII violations after this Court's earlier

decision in *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702 (1978), I dissent from that part of the Court's judgment that categorically denies relief to the post-*Manhart* retirees.[1]

## I

Until its amendment in August 1983, the pension plan the State of Florida operated for its employees discriminated on the basis of sex in a manner prohibited by Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* To recapitulate briefly, the plan operated as follows: A state employee, upon retirement, could choose between two basic pension options—a single-life plan or a joint-annuitant plan. An employee selecting the single-life plan received benefits tied to the employee's salary and length of service. Because the employee's sex was irrelevant to the benefits paid under the single-life plan, this part of Florida's pension plan did not run afoul of Title VII. If, however, an employee selected a joint-annuitant plan, the amount of benefits the employee received under that plan would be tied to the actuarial value of the employee's single-life plan—a value established for this purpose by the use of sex-based actuarial tables. Because, on the average, men do not live so long as women, these tables ascribed a greater value to a female employee's single-life plan than to a male's, and, accordingly, the monthly benefits paid out under a female retiree's joint-annuitant pension were greater than those paid out under a male retiree's joint-annuitant pension. It is undisputed that Title VII prohibits this kind of sex-based distinction in the provision of retirement benefits.

The issue in this case, of course, is not whether the pension plan Florida operated is barred by Title VII, but, rather, whether retirees are entitled to retroactive relief for Flori-

---

[1] The parties raise other issues regarding the scope of Florida's retroactive liability. See *ante,* at 229–230, n. 3. Like the Court, I take no position on these issues.

da's discrimination.[2]   Although retroactive relief is not mandatory in a Title VII case, see § 706(g), 42 U. S. C. § 2000e–5(g), the make-whole purpose of Title VII creates a "presumption in favor of retroactive liability [that] can seldom be overcome." *Manhart*, 435 U. S., at 719.   As the Court notes, however, in the context of pension plans that run afoul of Title VII, the presumption of retroactive liability may be defeated if the relevant law concerning Title VII was not sufficiently clear at the time of the violation.   *Ante*, at 230.   In both *Manhart* and *Norris*, we found that, although pension plans were being operated in violation of Title VII, retroactive liability was inappropriate in part because the plan administrators reasonably might have assumed that their plans were lawful.

In denying retroactive relief to the post-*Manhart* retirees in this case, the Court concludes that it was not until the decision in *Norris* in 1983 that Florida had notice that its pension plan was unlawful.   It is on this point, in my view, that the Court goes astray.

In *Manhart*, we were faced with a plan which required female employees to make greater contributions out of their paychecks than their male counterparts in order to obtain the same monthly pension benefits upon retirement.   The employer sought to justify this difference by noting that since, as a group, female employees lived longer than male employees, "[t]he cost of a pension for the average retired female is greater than for the average male retiree because more monthly payments must be made to the average woman." 435 U. S., at 705.   This difference in cost, argued the employer, allowed the difference in contributions.   The *Manhart* Court accepted as true the employer's proffered rationale for its distinction, but nonetheless concluded that the plan violated Title VII.   As the Court put it: "The question . . . is

---

[2] I agree with the Court's conclusion that all the relief approved by the Court of Appeals properly is characterized as retroactive.

whether the existence or nonexistence of 'discrimination' is to be determined by comparison of class characteristics or individual characteristics." 435 U. S., at 708. The Court's conclusion in *Manhart* was that Congress intended that individual characteristics should control. See *id.*, at 708–709. Therefore, Title VII required that the pension plan be funded through sex-neutral employee contributions.

It is difficult to see any important distinction between that case and this one. The Court today relies on the fact that the pension plan at issue in *Manhart* discriminated at the contribution stage, while in this case the discrimination surfaced at the payment stage. In my view, it was always clear that this was a distinction without a difference. In *Manhart*, one sex took home less pay than the other in order to receive the same benefits upon retirement. Here, the take-home pay was the same, but one sex received a greater benefit upon retirement than the other. Both plans violated Title VII because the employer discriminated between men and women as a class. I see no plausible theory on which we might have distinguished the latter situation from the former, and the Court today offers none. In short, *Manhart* laid down a general rule that any employer-operated pension plan that relied on actuarial differences between women and men to the detriment of either group was prohibited by Title VII. Florida's pension plan violated this rule as clearly as did the plan at issue in *Manhart*.

*Manhart*'s "open-market exception" cast no doubt on this fundamental holding. The majority focuses on the statement in *Manhart* that it might be lawful for "an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market," 435 U. S., at 717–718. The Court ignores, however, the explanatory footnote to that statement, which clearly articulated its rationale: "Title VII . . . primarily govern[s] relations between employees and their employer, not

between employees and third parties." *Id.*, at 718, n. 33. Thus, it should have been evident from the start that the open-market exception had nothing to do with a distinction between discrimination at the contribution stage and discrimination at the benefit stage. Rather, the exception involved a distinction between discrimination by an employer and discrimination by a third party, the latter being generally outside the scope of Title VII.

Our decision in *Norris* confirms, rather than casts doubt on, the conclusion that the unlawfulness of Florida's pension plan was established and made manifest by our decision in *Manhart*. The five Justices in *Norris* who found the type of plan there at issue barred by Title VII considered as obvious the application of *Manhart*'s rationale to the payment of unequal benefits:

> "We have no hesitation in holding, as have all but one of the lower courts that have considered the question, that the classification of employees on the basis of sex is no more permissible at the pay-out stage of a retirement plan than at the pay-in stage." 463 U. S., at 1081 (footnotes omitted).
>
> "[I]t is just as much discrimination 'because of . . . sex' to pay a woman lower benefits when she has made the same contributions as a man as it is to make her pay larger contributions to obtain the same benefits." *Id.*, at 1086.

The *Norris* majority's rejection of the contribution/benefit distinction was based almost entirely on the reasoning of *Manhart*, and came without mention of the open-market exception. See 463 U. S., at 1081–1086. See also *id.*, at 1108–1109 (O'CONNOR, J., concurring) ("Title VII *clearly* does not allow an employer to offer a plan to employees under which it will collect equal contributions, hold them in a trust account, and upon retirement disburse greater monthly checks to men than women") (emphasis added).

Similarly, Justice Powell's opinion for those Members of the Court who thought that the pension plan at issue in *Norris* did not violate Title VII focused on the distinction not between contributions and benefits but between employer-operated pension funds and those, like the one in *Norris*, that were administered by third parties. See 463 U. S., at 1099, 1103. His opinion did not contest the conclusion reached by the Court, *id.*, at 1086, that the plan at issue in *Norris* "plainly would have violated Title VII" if, like the plan under scrutiny here, it had been operated by the employers themselves.

Nor, finally, does the ultimate conclusion of five Justices in *Norris* that retroactive liability was inappropriate in that case call for a like conclusion here. The majority's decision that *Manhart* did not provide notice that the plan at issue in *Norris* violated Title VII was based solely on the view that, because of the open-market exception, "an employer reasonably could have assumed that it would be lawful to make available to its employees annuities *offered by insurance companies* on the open market." 463 U. S., at 1106 (Powell, J., dissenting in part and concurring in part) (emphasis added). See also *id.*, at 1110 (O'CONNOR, J., concurring) (referring to "pension plan administrators, who may have thought until our decision today that Title VII did not extend to plans *involving third-party insurers*") (emphasis added). The basis of the reasonable assumption of the lawfulness of the plan in *Norris*—the involvement of third-party insurers—simply has no application in this case.[3]

---

[3] The majority also places some reliance on a Department of Labor study dated nearly five years after our decision in *Manhart*, which estimated: "In the defined benefit plan sector, 45 percent of participants are in plans using sex-based tables. In the defined contribution plan sector, 74 percent of participants are in plans using sex-based tables." United States Dept. of Labor, Cost Study of the Impact of an Equal Benefits Rule on Pension Benefits 2 (Jan. 1983). See *ante*, at 233–234. As Florida concedes, however, the Department of Labor's survey made no distinction between employer-operated plans, like the plan in this case, and employer-sponsored

Because I conclude that the unlawfulness of Florida's pension plan was "clearly foreshadowed" by our decision in *Manhart*, and did not depend on a "new principle of law" announced in *Norris*, 463 U. S., at 1109 (O'CONNOR, J., concurring), I naturally disagree with the Court's conclusion that retroactive liability would be "inequitable." To the contrary, I believe such relief is clearly appropriate. See *id.*, at 1093. Cf. *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106 (1971) ("[T]he decision to be applied nonretroactively *must* establish a new principle of law") (emphasis added). I note, in addition, that no special factors are presented here that would make an award of retroactive relief inequitable.

While I conclude that our decision in *Manhart* put Florida on notice that its pension plan violated Title VII, and that therefore retroactive relief is appropriate for post-*Manhart* retirees, I agree with the majority that those respondents who retired before our decision in *Manhart* are not entitled to retroactive relief. An award of retroactive relief to pre-*Manhart* retirees in effect would penalize Florida for its pre-*Manhart* use of sex-based annuity tables. A retroactive award of this kind would not be in accord with our decision in *Manhart* to deny such relief because, prior to that decision, the use of sex-based tables reasonably might have been assumed to be lawful.

---

plans, like the plan in *Norris*. See Brief for Petitioners 33, n. 27. Yet it is only the former category of plans that *Manhart* established was in violation of Title VII. The study thus throws little light on the issue in this case.

Nor do I find persuasive the Court's emphasis on the fact that Florida also offered a nondiscriminatory single-annuitant option. See *ante*, at 234. The Court explained in *Norris:* "Title VII forbids all discrimination concerning 'compensation, terms, conditions, or privileges of employment' . . . . An employer that offers one fringe benefit on a discriminatory basis cannot escape liability because he also offers other benefits on a nondiscriminatory basis." 463 U. S., at 1081–1082, n. 10. Neither the language of Title VII nor precedents of this Court provided a basis for the contrary conclusion, even prior to the decision in *Norris*.

## II

In summary: I conclude that our decision in *Manhart* supplies the date after which Florida should be held liable for its failure to use unisex tables in calculating retirement benefits. Accordingly, I concur in that part of the Court's judgment that denies relief to pre-*Manhart* retirees, but, for the reasons stated above, I dissent from that part of its judgment that categorically denies relief to post-*Manhart* retirees.

JUSTICE STEVENS, dissenting.

All of us agree that discrimination in the collection of contributions from employees prior to our decision in *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702 (1978), cannot be remedied retroactively. A somewhat different issue is presented, however, when there is discrimination in the payment of benefits to employees who retired before *Manhart* was decided. The District Court and the Court of Appeals in this case agreed that it would be inequitable to grant retroactive relief that would adjust the benefits paid to pre-*Manhart* retirees for the period of unlawful discrimination that occurred prior to the date the District Court entered its judgment. Both of those courts concluded, however, that it would be appropriate to grant prospective relief that would increase the benefits payable to male retirees in the future. I agree.

It must be conceded that there is no recovery for any violation that occurred prior to our decision in *Manhart*. In the present case, however, I think it clear that each month's disparate retirement check constitutes a separate violation. Unlike *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073, 1105, n. 10 (1983), the District Court's order in this case does not call upon the State "to fund retroactively the deficiency in past contributions made by its . . . retirees." (Powell, J., dissenting in part and concurring in part). Rather, even to the extent that the plan was in the past par-

tially funded by contributions on behalf of individual employees, those contributions are not directly tied to the employees' benefit payments.[1] Benefits are instead calculated on the basis of a percentage of average annual compensation of the participating employee. App. to Pet. for Cert. A39. As the Court of Appeals correctly concluded, given the fact that the order of relief is accordingly prospective in nature, the defendants should not be permitted to "continue to discriminate" in violation of the statute. 805 F. 2d 1542, 1548 (CA11 1986). The failure to "top up" the pre-*Manhart* retirees' future benefit payments is akin to the perpetuation of past discrimination that we condemned in *Bazemore* v. *Friday*, 478 U. S. 385 (1986).[2] Moreover, as both the District

---

[1] As the Court of Appeals explained:

"[B]enefits in the [Florida Retirement System] are not based on individual contributions for individual employees. Instead the legislature sets a contribution rate for the employer based on the pension plan's financial needs. The Florida legislature has the power and responsibility to increase the contribution rates periodically to cover operating costs and the unfunded accrued actuarial liability." 805 F. 2d 1542, 1551 (CA11 1986).

During the period from 1970 to 1975, the plan was funded by a combination of contributions from employees and employers, but since 1975 has been funded entirely with public funds. *Id.*, at 1545–1546.

[2] In *Bazemore*, we held that a public employer has a duty to eradicate salary differentials created as a result of a pattern or practice of racial discrimination engaged in prior to the extension of Title VII to public employers, but perpetuated thereafter. We wrote:

"The error of the Court of Appeals with respect to salary disparities created prior to 1972 and perpetuated thereafter is too obvious to warrant extended discussion: that the Extension Service discriminated with respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the Extension Service became covered by Title VII. . . . While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed.

"Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." 478

Court and the Court of Appeals concluded, there are no special equities in this case militating against the award of this type of prospective relief.

I am in complete accord with the result reached by the District Court and the Court of Appeals. Accordingly, while I also agree with JUSTICE BLACKMUN's exposition of the flaws in this Court's analysis, I would affirm the judgment of the Court of Appeals in its entirety.

---

U. S., at 395–396 (BRENNAN, J., for a unanimous Court, concurring in part).