# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-1633

CHARLIE REESE, JR.,

*Plaintiff-Appellant,*

v.

ICE CREAM SPECIALTIES, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 4:01cv0016AS— **Allen Sharp**, *Judge.*

———————

ARGUED APRIL 23, 2003—DECIDED OCTOBER 30, 2003

———————

Before BAUER, MANION, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Charlie Reese, Jr. never received the raise he claims was due to him after he had worked six months for Ice Cream Specialties, Inc. (ICS). Reese says ICS did not award him the higher pay rate because he is African-American, and he sued for discrimination under Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e *et seq.* The district court granted summary judgment to ICS, holding that Reese's claim was untimely because he waited until years after he was denied the raise to file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). Reese contends that his claim was timely under the continuing violation theory because each week's paycheck was a fresh discrimi-

natory act. We conclude that the rule of *Bazemore v. Friday*, 478 U.S. 385 (1986), to the effect that each new paycheck is a separate wrong (recently reaffirmed in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 111-12 (2002)), governs this case, and that it must therefore be remanded for further proceedings.

# I

Because summary judgment was granted against Reese, we present the following account of the facts in the light most favorable to him. Reese began working for ICS in August 1996; his initial pay rate was $7.85 per hour. When ICS hired Reese, it promised to raise his hourly wage by 45¢ in February 1997, his six-month anniversary. ICS did not do so for Reese, however, even though it did award a six-month raise to its white male employees.

Reese did not realize that his six-month raise had never been awarded until August 2000, some three-and-a-half years later. At that time, prompted by an unrelated state investigation into allegations of discrimination at ICS, Reese requested a copy of his payroll records and noticed that ICS had never paid him the raise. After discovering that he had not received the raise, Reese filed a charge of race discrimination with the EEOC in November 2000. Later that month the EEOC dismissed his charge as untimely.

Reese then sued ICS *pro se*. ICS moved for summary judgment on the basis that Reese had not filed his charge with the EEOC within 300 days of the alleged violation. See *Minor v. Ivy Tech State College*, 174 F.3d 855, 857 (7th Cir. 1999). ICS argued that its failure to give Reese his six-month raise was a single incident that had occurred three-and-a-half years before Reese filed his charge. The district court agreed that Reese's EEOC charge was untimely, rea-

soning that the "sole discriminatory act" had occurred in February 1997. In a footnote, the court considered the possible applicability of the "continuing violation" theory, given that ICS's alleged failure to award Reese a raise had continuing consequences for his salary. But the court determined that the company's failure to pay Reese a higher amount each pay period did not constitute a series of new violations or one "continuing" violation.

Reese appealed. This court appointed counsel to represent Reese, and directed counsel to address the relevance to Reese's claim of the Supreme Court's application of the continuing violation theory in *Bazemore*, *supra*, which held that each discriminatory paycheck an employee received constitutes a separate violation of Title VII.

## II

The fate of Reese's claim turns on the proper characterization of the wrong or wrongs he has suffered. Three possibilities exist. First, ICS's refusal to award him the raise might have been a single discriminatory act that took place in February 1997. Second, the course of events that led to a long series of paychecks that were lower than they should have been might be the type of unlawful employment practice that cannot be said to occur on any particular day, but instead depends on the cumulative effect of individual acts—that is, it might have given rise to a continuing violation. See *National Railroad Passenger Corp.*, 536 U.S. at 115. Third, Reese might have suffered from numerous discrete acts of discrimination, each independently actionable, some of which would now be barred by the 300-day statute of limitations and others of which would be timely. The district court thought that the first of these descriptions best applied to Reese's case; it did not distinguish sharply between the latter two possibilities.

Because it represents the Supreme Court's most recent word on this subject, we begin our analysis with a look at *National Railroad Passenger Corp.* In that case, the respondent Morgan had sued the National Railroad Passenger Corporation (known everywhere as Amtrak) raising claims of both discrete discriminatory and retaliatory acts and of a racially hostile work environment. The Court took the case to consider "whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside [the 180 or 300-day] statutory time period." 536 U.S. at 105. In its decision, the Court first addressed the question of when an unlawful employment practice "occurred" for purposes of the limitations period. It began with the straightforward observation that "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 110. It went on to explain why the use of the term "unlawful employment practice" did not warrant the conclusion that a practice could endure or recur over a period of time:

> We have repeatedly interpreted the term "practice" to apply to a discrete act or single "occurrence," even when it has a connection to other acts. For example, in *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 234 (1976), an employee asserted that his complaint was timely filed because the date "the alleged unlawful employment practice occurred" was the date after the conclusion of a grievance arbitration procedure, rather than the earlier date of his discharge. The discharge, he contended, was "tentative" and "nonfinal" until the grievance and arbitration procedure ended. Not so, the Court concluded, because the discriminatory act *occurred* on the date of the discharge— the date that the parties understood the termination to be final. *Id.,* at 234-235. Similarly, in *Bazemore v. Friday*, 478 U.S. 385 (1986) (*per curiam*), a pattern-or-practice case, when considering a discriminatory salary structure, the

> Court noted that although the salary discrimination began prior to the date that the act was actionable under Title VII, "[e]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII . . . ." *Id.*, at 395.

536 U.S. at 111-12. Later in the opinion, the Court recognized that a certain class of violations does not involve discrete acts, and thus these violations do not lend themselves to as much temporal precision. "Their very nature involves repeated conduct." *Id.* at 115. Unlike discrete discriminatory acts, a single act of harassment may not be actionable on its own; it is the cumulative effect instead that matters. *Id.*

Applying this framework to the case before us, it is relatively easy to rule out the middle option of a continuing violation. Either one discrete act occurred in February 1997, or a series of separate discrete acts occurred (one per paycheck), each one of which would be actionable on its own if the other prerequisites to suit were satisfied.

Reese argues that his claim is timely because each paycheck he received during the 300-day period before he filed his EEOC charge was a fresh act of discrimination within the limitations period. (Note that he wisely concedes that he cannot recover for pay periods that ended prior to the 300-day cutoff.) In support he relies on *Bazemore*, which this court followed in *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996), another case in which a plaintiff's paychecks continued to be affected adversely by the employer's prior discriminatory practices in setting employee wages. The plaintiff in *Wagner* continued working for her employer after signing an agreement in which she released all existing claims. *Id.* at 530. She later sued her employer for wage discrimination based upon the paychecks she received after signing the release. *Id.* at 534. This court

concluded that each paycheck she received was a fresh act of discrimination regardless of when the discriminatory wage practices began. *Id.*

Cases in which the focal point of the plaintiff's complaint is a singular event or a broad program or system that affects pay, as opposed to the pay level itself, are different. Thus, the Supreme Court held in *Delaware State College v. Ricks*, 449 U.S. 250 (1980), that a university's allegedly discriminatory decision to deny tenure to the plaintiff was a discrete act, and that the plaintiff's claim accrued at the time of the tenure denial. *Id.* at 257-58. See also *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977) (continuing impact of facially neutral seniority system did not support a finding of a present violation). Thus, for example, in *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130 (2d Cir. 2003), the court found that an employer's rejection of an employee's proposed accommodation of his religious observance requirements was a discrete act that must be the subject of a complaint to the EEOC within 300 days of its occurrence. It explained that "[o]nce the employer has rejected the proposed accommodation, no periodic implementation of that decision occurs, comparable to the weekly cutting of a payroll check in *Bazemore*." *Id.* at 135. Similarly, in *Carter v. West Pub. Co.*, 225 F.3d 1258 (11th Cir. 2000), the court rejected the argument that West Publishing Company's employee stock program was a present violation of the law because the payment of dividends was a wage premium that enhanced employee compensation. *Id.* at 1264. The employee stock program itself was the "act" of the employer that was being challenged, not the neutral, nondiscriminatory payment of dividends after the fact. As in *Evans,* it was too late to challenge the system as a whole. See also *Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900, 911 (1989) (when seniority system is nondiscriminatory in form and application, limitations period runs from date of allegedly discriminatory adoption); *Florida v. Long*, 487

U.S. 223, 239 (1988) (*Bazemore* applies to continuing payments of discriminatory wages, which differs from payments under a pension plan, which is funded on an actuarial basis).

In contrast, the Third Circuit had a case much like ours, in which the plaintiff-employee claimed that he fell within the *Bazemore* rule because his initial pay grade classification was set too low because of his national origin (Hispanic), and each paycheck he received thereafter continued to reflect this discrimination. *Cardenas v. Massey*, 269 F.3d 251 (3d Cir. 2001). The court agreed that this was enough to defeat summary judgment, and it remanded the plaintiff's disparate pay claims for a determination on the merits. *Id.* at 258. As the Supreme Court put it in *Long*, "[i]n a salary case, . . . each week's paycheck is compensation for work presently performed and completed by an employee." 487 U.S. at 239. That point is especially true for the many employees in the U.S. economy who hold their jobs as employees-at-will, but it holds for everyone.

Notwithstanding these decisions, there is a line of cases decided in this court prior to *National Railroad Passenger Corp.* that are in tension with the rule that treats each check in a simple discriminatory pay claim as a new violation, but that treats other acts affecting pay more indirectly (tenure decisions, promotions, seniority systems, pension arrangements, etc.) as single-time events with future consequences. In *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997), issued a year after *Wagner*, the court decided that the continuing violation theory did not apply to a professor's claim that his employer subjected him to discriminatory pay and promotion decisions. As far as it goes, this conclusion is perfectly consistent with *Bazemore* and *National Railroad Passenger Corp.* As we explained above, the continuing violation concept is reserved for theories of liability that depend on

the cumulative impact of numerous individual acts, none of which is necessarily actionable in itself. Nonetheless, the panel also distinguished *Bazemore* itself, writing that:

> [i]n *Bazemore* and *NutraSweet*, the plaintiffs alleged that during the limitations period they failed to receive the amount of compensation that the law entitled them to. The fact that this level had been determined before the limitations period meant only that the violation of their rights was predictable. If an employer tells his employee, "I am going to infringe your rights under Title VII at least once every year you work for me," this does not start the statute of limitations running on the future violations, violations that have not yet been committed. This case is at the opposite pole. There were no new violations during the limitations period, but merely a refusal to rectify the consequences of time-barred violations. It is not a violation of Title VII to tell an employee he won't get a raise to bring him up to the salary level that he would have attained had he not been discriminated against at a time so far in the past as to be outside the period during which he could bring a suit seeking relief against that discrimination.

121 F.3d at 1140. See also *Snider v. Belvidere Township*, 216 F.3d 616, 618 (7th Cir. 2000).

The *Dasgupta* panel ultimately concluded that the professor's claim was untimely because he did not file a charge with the EEOC until eight years after his employer's last allegedly discriminatory decision affecting his pay. *Id.* at 1140. It held that the professor's paychecks were merely "effects within the limitations period of unlawful acts that occurred earlier. . . . A lingering effect of an unlawful act is not itself an unlawful act, however, so it does not revive an already time-barred illegality . . . ." *Id.* Relying on *Dasgupta*, the defendants argue that the continuing vio-

lation theory does not apply to Reese's contention that each paycheck he received was a fresh act of discrimination, and that therefore Reese's claim is untimely.

We understand why not only the defendants here, but parties around this circuit in general, find the current state of affairs to be confusing. It is difficult, to say the least, to distinguish between the situation in *Dasgupta* and that in *Wagner*, a case that *Dasgupta* did not purport to overrule. It is possible, of course, that the *Dasgupta* panel thought that *Wagner* did not give adequate scope to the Supreme Court's decision in *Ricks*, and it might have been influenced by the fact that *Bazemore* was a *per curiam* opinion (albeit one that adopted in this particular instance the language found in Justice Brennan's concurring opinion, see 478 U.S. at 386). Any doubts about the continuing validity of the *Bazemore* rule, however, were put to rest by *National Railroad Passenger Corp.* As a matter of theory, the plaintiff in *Dasgupta* may have doomed himself by arguing the wrong theory (continuing violation). His case was also more complex than a simple pay allegation, as he was also trying to pursue claims for alleged discrimination in refusing to promote him. But at least in part, all of these cases involved discriminatory decisions made outside the limitations period that continued to have an adverse effect on the subset of paychecks that the plaintiff received during the limitations period. The only act repeated during the limitations period was the employer's delivery of the paycheck that was allegedly lower than the checks delivered to similarly situated employees outside the protected class.

In light of the fact that the Supreme Court itself is not yet ready to give up on *Bazemore*, we conclude that we are obliged to follow its rule for strict paycheck cases that do not involve allegations of discrete discriminatory acts such

as failures to promote, or discriminatory plans or systems.[1] Indeed, our sense of the law here is analogous to the opinion the Second Circuit had of the law relating to a manufacturer's right under the antitrust laws to insist unilaterally on a specific resale price, which in the years prior to *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717 (1988), gave little leeway for such practices. In *George W. Warner & Co. v. Black & Decker Mfg. Co.*, 277 F.2d 787 (2d Cir. 1960), the court commented that "[t]he Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise." *Id.* at 790. Just so here: the Court has left a similar narrow channel for Title VII plaintiffs who wish to complain that their paychecks, in compensation for work they have presently performed and completed in pay periods within the limitations period, are discriminatorily low because of an earlier act that occurred outside the limitations period. Each paycheck is the kind of discrete act to which the Court referred in *National Railroad Passenger Corp.*; thus, checks corresponding to pay periods before the 300-day limit are time-barred, but those within it may form the basis of a claim.

Applying this theory to Reese's case, we conclude that his claims for pay within the 300-day period are not time-barred, because each check that ICS paid Reese was potentially a fresh act of discrimination. This conclusion is consistent with similar results our colleagues in numerous other circuits have reached. See *Anderson v. Zubieta*, 180

---

[1] This conclusion is consistent with that reached by another panel of this court on the identical issue, in an opinion issued contemporaneously with this one. See *Hildebrandt v. Illinois Dept. of Natural Resources and Richard Little*, Nos. 01-3064 and 01-3690, slip op. at 18 (7th Cir. October 30, 2003).

F.3d 329, 335-37 (D.C. Cir. 1999); *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997); *Cardenas, supra* (Third Circuit); *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 345-51 (4th Cir. 1994); *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 167-68 (8th Cir. 1995) (*en banc*); *Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1011 (10th Cir.), *cert. denied*, 537 U.S. 941 (2002). Reese has shown (for purposes of summary judgment) that ICS gave six-month raises only to similarly-situated white employees, not to him, and that ICS's conduct adversely affected every paycheck Reese has since received. We conclude that *Bazemore* compels the conclusion that each paycheck constituted a fresh act of discrimination, and thus that his suit is not untimely solely because the initial act of discrimination occurred when it did. We naturally express no opinion on any other aspect of the case, including the question whether the white employees who did receive the six-month raise are still employed with the company, and if not, whether that affects his claim on the merits.

### III

For these reasons, we VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*