UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

The FIRST NATIONAL BANK OF CHICAGO, Defendant.

No. 88 C 3783.

United States District Court, N.D. Illinois, E.D.

June 26, 1990.

---

**11.** If criminal history category VI is used, the range is 100 to 125 months.

Gordon Waldron, Sr. Trial Atty., Dana R. Hutter, Trial Atty., E.E.O.C., Chicago, Ill., for plaintiff.

Michael A. Warner, Patricia A. Brandin, Condon A. McGlothlen, Seyfarth, Shaw, Fairweather & Geraldson, Lynn Goldstein, Nancy Lindsay, First Nat. Bank of Chicago, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Upon retiring in 1983, Benjamin C. Homola became disquieted that, whatever advantages his sex were thought to have given him in life, his monthly pension payments would not be among them. His employer of thirty years, the First National Bank of Chicago ("the Bank"), like many employers of a bygone era, had once permitted women to retire at a younger age— and so accumulate pension benefits at a faster rate—than similarly situated men. The Bank gradually eliminated these differences in response to Supreme Court decisions and Equal Employment Opportunity Commission opinions holding that men and women must be treated identically with respect to their earning and receipt of pensions. But the Bank has steadfastly refused to alter the rate at which it credited pension benefits to men and women before the effective date of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

This case was filed by the EEOC on behalf of Homola and other men who worked for the Bank before July 2, 1965, the date Title VII took effect, and who retired thereafter. It alleges a violation of Title VII § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1), and the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d). Both sides have moved for summary judgment pursuant to Fed.R.Civ.P. 56, and their positions have been generously briefed. Because the material facts are not genuinely disputed, the Court may grant judgment as a matter of law. *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 424 (7th Cir.

1989). Because it does so in favor of the Bank, the Court has drawn all reasonable inferences in favor of the EEOC. *See Spring v. Sheboygan Area School District,* 865 F.2d 883, 886 (7th Cir.1989).

## I. FACTS

The EEOC filed this case in May 1988, based on a charge filed with the Commission by Homola shortly after his retirement from the Bank as a vice president on February 1, 1983. In his charge, Homola, a lawyer, had protested the Bank's use of a pension benefit formula that gave him a lower benefit than he would have received had he been a woman. Homola's right to a pension was governed by the Bank's pension plan as restated on January 1, 1980. Pl. 12(1) Statement ¶ 25. This plan was successor to a series of plans, as amended and restated through the years. For purposes of this motion, the plan as restated in 1980 will be called "the current plan."

The sex-based formula in the current plan has its root in pre-Title VII history. Before 1950, the Bank determined men and women's pensions the same way. Pl. 12(1) Statement ¶ 9. Starting in 1950, the Bank decided that men would earn credit toward their pension at a rate of 2% of their credited annual compensation up to a maximum of thirty-five years. Pl. 12(1) Statement ¶ 9; Def. 12(1) Statement ¶ 3. Women, however, would earn credit at 2.5% of their credited annual compensation up to a maximum of twenty-eight years. *Id.* The maximum annual pension for both men and women was thus 70% of credited salary. *Id.* The difference in crediting rates coincided with a sex-based difference in early retirement ages—age 55 for women and age 60 for men. Def. 12(1) Statement ¶ 3.[1]

Title VII became effective on July 2, 1965. By a letter dated September 13, 1968, the General Counsel of the EEOC opined that, though early retirement ages favoring women were discriminatory toward men, existing retirement ages could be gradually equalized to avoid hardship.

Def. 12(1) Statement ¶ 5 & Ex. 3. Effective January 1, 1971, the Bank amended its pension plan to phase out the earlier retirement age for women. Def. 12(1) Statement ¶ 5. A corresponding amendment provided that men and women would earn pension credits at a uniform rate of 2% per year for each year of service after 1970. *Id.* By subsequent amendment in 1976, the bank revised the pension plan to equalize the pension credit rate for men and women at 2.5% per year for the years between July 2, 1965 (the effective date of Title VII), and December 31, 1970. Def. 12(1) Statement ¶ 7.

Thus, under the Bank's current plan, which governs Homola's pension rights, women were credited with 2.5% of their credited compensation for each year of service before July 2, 1965, while men were credited with only 2% of their credited compensation for these years. Thereafter, men and women were treated identically, receiving credit at a rate of 2.5% per year of service from July 2, 1965, through December 30, 1970, and 2% per year of service beginning January 1, 1971. Pl. 12(1) Statement ¶ 23.

The Bank's current plan is a defined benefit plan. Def. 12(1) Statement ¶ 8. *Compare* Pl. 12(m) Statement ¶ 8. "[A] defined benefit plan is a plan that defines a projected benefit and then funds that benefit either by actuarial methods or by purchasing insurance or annuity contracts." R. Osgood, *The Law of Pensions and Profit–Sharing* § 2.3, at 46 (1984). As pointed out by Donald Hoy, the Bank's employee benefits manager, "Whether and to what extent an employer contribution is needed to fund the Plan is determined annually by the Bank's actuaries." Hoy Aff. ¶ 10. According to Hoy's uncontradicted affidavit, the process is as follows:

> The actuaries aggregate relevant data for individual Plan participants which, together with investment results, determines Plan funding needs. Relevant participant data includes actual salary

---

1. The EEOC points out that these were also mandatory retirement ages at the Bank's discretion (compare Def. 12(1) Statement ¶ 3 with Pl.

12(m) Statement ¶ 3 and Pl. 12(1) Statement ¶ 8), but the point is immaterial here.

figures, credited years of service, anticipated retirement dates, turnover rates, salary progressions, etc. In addition, *the actuaries consider benefit accrual rates under the Plan for all relevant periods*, including differential accrual rates for men and women for years prior to July 2, 1965.

*Id.* (emphasis supplied). *See also* Jolls Aff. ¶¶ 4–5. By the term "accrual rate," Hoy means the annual crediting of either 2% or 2.5% of credited compensation toward an individual's pension. Def. 12(1) Statement ¶ 2. The EEOC quarrels with the use of the term accrual. Pl. 12(m) Statement ¶ 2. "Instead," the EEOC contends, "the formulas calculating pension benefits takes into account years of participation in the plan." Nevertheless, the EEOC has not put forward evidence to challenge Hoy's sworn statement that the Bank's actuaries currently take into account the "differential accrual rates" in determining whether additional contributions are necessary to fund the promised benefits. *Accord* Jolls Aff. ¶ 5.

All agree that the Bank has been sucessful so far in managing the pension plan fund—so successful, in fact, that the plan has for the past twenty years needed no additional contributions by the Bank or by the plan participants. Before 1970, the Bank contributed to the fund a fixed percentage of each participant's salary, regardless of sex. Pl. 12(1) Statement ¶ 2. This contribution declined from an initial high of 12% of each participant's salary in the early 1950s, to 10% in the late 1950s or 1960, to 5% in 1965, and finally to no contributions since 1969. *Id. & id.* ¶ 11. Similarly, before 1971, participants contributed 2% of their annual salary, regardless of sex, by means of monthly payroll deductions made by the Bank. Pl. 12(1) Statement ¶ 1. By resolution dated December 23, 1970, the pension plan executive committee abolished employee contributions beginning in 1971 and ordered a refund of contributions (with interest) previously made by participants who had not yet retired. Pl. 12(1) Statement ¶ 10.

## II. LAW

The EEOC's theories under Title VII and the EPA are basically the same, but due to the peculiarities of each statute, the relief sought under each varies. Common to both is a demand that the Bank amend its plans to eliminate all sex-based disparities in the future. As for monetary relief, under Title VII the EEOC seeks back benefits with respect to pension payments made after April 18, 1981—two years before Homola filed his charge with the Commission. *See* 42 U.S.C. § 2000e–5(g). Under the EPA, the EEOC seeks back benefits with respect to pension payments made after May 2, 1986—two years before this suit was filed. *See* 29 U.S.C. § 255(a). The EEOC also argues that the reduction of the pension crediting rate for women to 2% from 2.5% beginning in 1971 broke the EPA rule against lowering the wage rate of the favored sex in order to remedy a violation. *See* 29 U.S.C. § 206(d). It seeks relief with regard to pension benefits paid to women after May 2, 1986.

Because the law of liability with respect to Title VII is most developed, and thus overshadows analysis under the EPA (see *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1260 n. 5 (7th Cir.1985)), the Court will discuss it first.

### A. *Title VII*

#### 1. Timeliness of the Charge

A prerequisite to suit under Title VII is that the aggrieved party file a timely charge with the Commission. 42 U.S.C. § 2000e–5(e); *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989). In Illinois, a so-called "deferral state," a charge must be filed at least within 300 days of an alleged violation. *Gilardi v. Schroeder*, 833 F.2d 1226, 1229–30 (7th Cir.1987); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir.1989). The Bank argues that its retroactive cure of pension crediting disparities for years after July 2, 1965, means that the 300–day statute of limitations began to run from that date, and that Homola's charge of April 18, 1983, was nearly two decades too late. Def. Memorandum in Support, at 5.

The Bank constructs this argument from the line of Supreme Court cases that culminated in *Lorance v. AT & T Technologies*, — U.S. —, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). In *Lorance*, an employer and labor union had agreed to adopt a special seniority system to govern the highly paid "testers" job classification within a plant. Before this agreement, testers held their positions as testers according to their overall seniority within the plant. Under the new system, employees held their positions as testers according to their length of time as testers, regardless of plantwide seniority. *Id.* 109 S.Ct. at 2263. The efffect was to protect the seniority of those employees—overwhelmingly male—who had been testers for the longest period of time. On its face, however, the seniority plan was nondiscriminatory. *Id.* 109 S.Ct. at 2264. Although adopted in 1979, the new plan was not challenged until 1983, after the plaintiffs, all women, had lost their positions as testers during an economic slowdown. *Id.* at 2264.

The Supreme Court held that the suit was untimely because the statute of limitations began to run upon the adoption of the seniority system, "not upon the time at which the *consequences* of the acts became the most painful." *Id.* at 2266 (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980)). In so concluding, the Supreme Court held foreclosed by its precedent plaintiffs' claim that enforcement of the seniority system constituted a "continuing violation" of Title VII. *Id.* 109 S.Ct. at 2265–66.

It is clear from the foregoing that *Lorance* is not directly on point, involving as it does a seniority system rather than a pension plan. Nor do the other Supreme Court decisions in this area clearly dictate the result here. *See Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam) (limitations period began running under 42 U.S.C. § 1983 on date nontenured school administrators were notified that they would be let go, not on actual date of termination); *Ricks*, 449 U.S. 250, 101 S.Ct. 498 (Title VII limitations period began running upon notification of tenure

denial); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (discriminatory dismissal triggered Title VII limitations period; enforcement of facially nondiscriminatory seniority system did not create "continuing violation."). The reasoning of these decisions (particularly *Lorance*) could support an argument that the limitations period begins to run from the time that a pension plan beneficiary learns (or should have learned) of a discriminatory provision. Like a seniority system, a pension plan creates contractual rights that in turn give rise to various expectations by the holders of these rights. Accordingly, it could be argued that challenges to pension plans must be made as soon as possible in order to minimize the unsettling of settled expectations. *Cf. Lorance*, 109 S.Ct. at 2269. The Court, however, believes that the analogy, as well as the argument, does not stand up to careful analysis.

*Lorance* begins with the proposition that "seniority systems are afforded special treatment under Title VII." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977) (quoted in *Lorance*, 109 S.Ct. at 2265). As *Lorance* points out, § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), has been construed as protecting seniority systems from invalidation absent the showing of a discriminatory purpose in their adoption. 109 S.Ct. at 2265. Thus, by statute, seniority systems are specially protected under Title VII. But even more important, *Lorance* dealt with a seniority system that, as the Supreme Court carefully noted, was "nondiscriminatory in form and application." *Id.* at 2268. Because the system in itself contained no invidiously discriminatory provisions, the only discriminatory act could be the system's adoption, not its application. *See id.* at 2265, 2268. By way of contrast, the Supreme Court emphasized at the end of its opinion in *Lorance:* "There is no doubt, of course, that a facially discriminatory seniority system (one that treats similarly situated employees differently) can be challenged at any time...." *Id.* at 2269.

This Court believes that the Bank's current pension plan, with its different crediting rates for men and women, is much more akin to a seniority system "that treats similarly situated employees differently" and thus "can be challenged at any time." *Id.* This interpretation seems to the Court a more natural reading of *Lorance,* and one that also makes sense as a matter of policy. As the EEOC has argued, the Bank's proposed rule would encourage litigation, rather than voluntary compliance, for an aggrieved participant would be forced to sue as soon as he discovered a discriminatory pension policy, instead of waiting for voluntary correction of an offending provision. This case itself is a good example of why such a rule would be counterproductive, because the Bank voluntarily corrected discriminatory aspects of its plan in 1971 and 1976 without the need for a lawsuit; yet the rule the Bank urges here would have demanded a lawsuit within days after the passage of Title VII.

■ The Bank's suggested rule also would put a new employee to the cruel choice of suing his employer soon after his hiring, or surrendering his rights. Noting the "paradox[ical]" effects of such a rule in *Heiar v. Crawford County, Wis.,* 746 F.2d 1190, 1194 (7th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985), the Seventh Circuit held that the Age Discrimination in Employment Act ("ADEA") limitations period begins running from the date that an employee receives "specific notice" that he will be discharged on a certain date pursuant to a mandatory retirement policy, rather than from the time that he first learned of the policy's existence. The court of appeals cautioned: "[N]o court has pressed the logic of the notice approach so relentlessly, or is likely to do so...." *Id.* It seems a reasonable extension of *Heiar* that the Title VII limitations period begins running

from the time a retiree receives specific notice that he will in fact receive discriminatory benefits, rather than from the time he first becomes aware that a discriminatory pension policy exists. *Cf. Jenkins v. Local 705, Int'l Brotherhood of Teamsters,* 713 F.2d 247, 253–54 (7th Cir.1983) (Employee Retirement Income Security Act ("ERISA") limitations period began running at time pension applicant received notice that application was denied).[2]

The Bank suggests, however, that Footnote 3 of *Lorance* should be read to hold this suit untimely. *See* 109 S.Ct. at 2266. In that footnote, Justice Scalia, writing for the majority, likened the harm done to an employee by the discriminatory adoption of a seniority system to the harm done to an insured when an insurance company delivers a policy with a face value less than the amount of coverage for which the insured has paid. *Id.* But this analogy was put forward in *Lorance* to answer the dissent's argument that there was no "concrete" harm done to the plaintiffs upon the adoption of the seniority system because any injury was only "speculative" until the system actually affected the plaintiffs' employment rights. *See id.* The analogy was intended only to illustrate the concrete nature of the plaintiffs' harm upon the adoption of the seniority system, and was not a considered elucidation of when, as a matter of Title VII law and policy, a future claim based upon a facially discriminatory pension plan should be considered to accrue.

Having resolved this procedural dispute, the Court turns to the merits.

### 2. Retroactivity

As noted at the start of this opinion, it was once common for pension plans to favor women by letting them retire with a full pension at a younger age than men. In *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Supreme Court sig-

---

**2.** The only discrimination cases from outside this circuit that involve pensions and that have been cited to this Court appear to be at loggerheads. *Compare Simmons v. South Carolina State Ports Authority,* 694 F.2d 63 (4th Cir.1982) *with Crosland v. Charlotte Eye Ear and Throat Hospital,* 686 F.2d 208 (4th Cir.1982) and *EEOC v. Westinghouse Electric Corp.,* 725 F.2d 211 (3d Cir.1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). All are pre-*Lorance,* their analyses conflict, and their reasoning has not swayed the Court one way or the other.

naled the end of this practice, holding it unlawful under Title VII to require female employees to make larger pension plan contributions than male employees, even though, actuarially, women as a class live longer than men and thus would need to make greater contributions to receive pension payments of equal size. *Manhart* was followed by *Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v. Norris*, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983), in which the Supreme Court held that Title VII forbade employers from offering retirement plans providing lower monthly benefits to women than to men who had made identical contributions, even though sex-based actuarial tables would have called for this result. A point of contention in both these decisions was whether retroactive relief—which could jeopardize the solvency of pension plans by undercutting the assumptions made by administrators when deciding how best fund the plans—should have been awarded. The Supreme Court revisited this issue in *Florida v. Long*, 487 U.S. 223, 108 S.Ct. 2354, 101 L.Ed.2d 206 (1988). The Bank argues that *Long* forbids maintenance of the EEOC's suit, and the Court agrees.

*Long* involved a class action suit brought by a group of men who had retired before the Supreme Court's decision in *Norris*. The plaintiffs had been participants in a defined benefit plan maintained by the State of Florida retirement system. *Id.* 108 S.Ct. at 2357–58. Although the plan provided for a "normal retirement benefit" that was identical for similarly situated male and female employees, it offered several "optional" joint annuity plans that paid lower monthly benefits to male participants and their survivors. *Id.* 108 S.Ct. at 2358. The optional plans made this distinction because, in calculating the amount of benefits available under them, the Florida system took into account the lesser life expectancy of males, as determined by sex-based actuarial tables. *Id.* After *Norris*, Florida adopted unisex actuarial tables providing identical benefits under all options for employees retiring after August 1, 1983, which was deemed to be the effective date

of *Norris*. *Id.* But male employees retiring before that date received no additional benefits.

Both the district court and the court of appeals held that *Manhart* gave ample notice that pension benefits, as well as contributions, must be uniform between the sexes, and thus the pre-*Norris* retirees were entitled to relief. *Id.* 108 S.Ct. at 2358–59. The lower courts further held that appropriate relief would consist of "topping up" pension benefits—that is, giving male retirees the difference between what they had in fact received and what they would have received if they had been female retirees—for men who had retired after October 1, 1978, the deemed effective date of *Manhart*, and before April 30, 1986, the date of the district court's judgment. *Id.* In addition, all class members were awarded topped-up future benefits from the date of judgment. *Id.* 108 S.Ct. at 2359.

In reversing, the Supreme Court addressed "[t]wo aspects of retroactivity analysis." *Id.* The first was the question of "the appropriate date for commencing liability for employer-operated pension plans that offered discriminatory payment options." *Id.* Contrary to the lower courts, the Supreme Court held that only its decision in *Norris* gave employers adequate notice that discriminatory benefits, as well as discriminatory contributions, violated Title VII. *Id.* 108 S.Ct. at 2359–63. The Court thus concluded that "*Norris* is the controlling liability date and that liability may not be imposed for pre-*Norris* conduct." *Id.* 108 S.Ct. at 2359. This conclusion then influenced the Supreme Court's analysis of the second aspect of retroactivity, namely, whether the lower courts' topping up of back benefits and future benefits constituted prospective or retroactive relief. Under its holding that *Norris* established the liability date, the Court held that the order of back-benefits "is retroactive without doubt." *Id.* 108 S.Ct. at 2363. But the Court held that the order of topped-up future benefits to the pre-*Norris* retirees also was retroactive, reasoning: "It is essentially retroactive to disrupt past pension funding assumptions by requiring

further adjustments based on conduct that could not reasonably have been considered violative of Title VII at the time the retirements occurred and funding provisions were made." *Id.* 108 S.Ct. at 2364. In so deciding, the Supreme Court rejected the argument that each benefit payment constituted a continuing violation of Title VII. *Id.*

The Supreme Court's opinion in *Long* undoubtedly adumbrates the inquiry this Court must undertake. And if the Court had had any apprehension about this, it would have been dispelled by the analysis of *Long* prepared by the EEOC's own Office of Legal Counsel and issued in a Policy Statement dated July 3, 1989. *See Policy Guidance Addressing the Issue of Retroactive Relief for Sex–Based Discrimination in Employee Retirement Plans,* Policy Statement No. N–915.037A, *reprinted in* Pension Plan Guide (CCH) ¶ 23,783W. (This statement superseded a preliminary version issued January 3, 1989; though shorter, the earlier version was similar to its predecessor in all material details. *See* Pension Plan Guide (CCH) ¶ 23,770T.) The Policy Statement is an interesting document for a number of reasons; foremost among them is that it appears to contradict the position taken by the regional office of the EEOC on several points of law material to this litigation. As a result, the local office is put in the unusual situation of distinguishing not only the authority cited by the Bank, but also the rationale of the EEOC's own Policy Statement. This oddity will be discussed more fully in due course.

The Court begins with the question of the appropriate liability date. In this litigation, the EEOC has argued that the controlling liability date here is July 2, 1965, the effective date of Title VII. Pl. Response, at 16–17; Pl. Amended Surreply, at 2. The argument is curious, because *Long* is a Title VII case, and it states in unequivocal terms:

> The issues before us turn on whether *Manhart's* invalidation of discriminatory contributions necessarily apprised employers that plans which were nondiscriminatory as to contributions must in every case be nondiscriminatory as to

benefits.... The point was not resolved in a definitive way until our decision in *Norris.* We hold further that employees who retired before the effective date of *Norris* are not entitled to a readjusted benefits payment structure.

108 S.Ct. at 2357.

The Policy Statement certainly reads *Long* to establish August 1, 1983, the deemed effective date of *Norris,* as an across-the-board liability date in Title VII actions:

> In light of the Supreme Court's decision in *Long,* it is the Commission's position that individuals who retired before the effective date of *Norris* (August 1, 1983) and who receive sex-based benefits under defined benefit pension plans are not entitled to any relief because no liability may be imposed for pre-*Norris* conduct.

Pension Plan Guide (CCH) ¶ 23,783W, at 25,189–10.

The sole case the EEOC relies on here to support its argument for a July 2, 1965, liability date is *Puckett v. United Air Lines, Inc.,* 705 F.Supp. 422 (N.D.Ill.1989). In that case, the court was called to rule on the validity of a Treasury regulation that proposed to apply retroactively a congressional amendment to the ADEA and ERISA. The amendment made clear that employers were required to grant full pension credit to employees who work past normal retirement age, but the statutory language did not indicate whether it was to have retroactive effect. *Id.* at 423. The issue for the court was whether the regulation was a reasonable interpretation of the legislative decision. *Id.* Pointing to the deference accorded administrative interpretations of ambiguous statutes, the court concluded that it was. *Id.* at 424.

This case, by contrast, involves no question of deference to administrative regulations. The EEOC's litigation posture is not the same thing as a rule issued pursuant to the Administrative Procedure Act (see *Wabash Valley Power Ass'n, Inc. v. Rural Electrification Administration,* 903 F.2d 445, 453 (7th Cir.1990)), and anyway, the closest thing there is to an administrative

rule in this case is the Policy Statement, which appears in conflict with the agency's litigation position. More significant, *Puckett* involved an express congressional choice to amend the ADEA, which is a different (though in many other respects similar) statute. This case, brought under Title VII, does not involve the construction of an express statutory command. As the Supreme Court has explained, " '[T]he rules that apply to [pension] funds should not be applied retroactively unless the legislature has plainly commanded that result.' " *Long*, 108 S.Ct. at 2362 (quoting *Manhart*, 435 U.S. at 721, 98 S.Ct. at 1382). In short, *Puckett* does not speak to the statutory issue at hand.

Stripped of *Puckett*, the EEOC's briefs have given the Court no reason why August 1, 1983, should not be deemed the relevant liability date. However, in discussing whether the EEOC's prayer for relief is intolerably retroactive, the EEOC's briefs have addressed this issue indirectly, for the discussion concerning the scope of a permissible remedy confronts the question of how broadly to read *Long. See* Pl. Response, at 17–20; Pl. Amended Surreply, at 2–3; Pl. Letter Dated August 28, 1989, at 1.

The EEOC's best argument is to limit *Long* to its facts. The case then can be read to address only the liability date for the use of sex-based actuarial tables in the calculation of retirement benefits. *See* Pl. Response, at 15–16, 18. In litigation counsel's words, "[T]his case does not deal with the complexities of sex-based actuarial tables, which were the subject matter in *Long....* [T]his case deals with a simple formula that gives men less pension credit than women...." Pl. Letter Dated August 28, 1989, at 1.

In the face of this argument, this Court's task is to determine how generally the rule of *Long* is to be understood—a task that by definition requires a thorough examination of the language of the case. *See American Jewish Congress v. City of Chicago*, 827 F.2d 120, 138 (7th Cir.1987) (Easterbrook, J., dissenting). A beginning observation is that *Long* concerns itself not sim-

ply with the narrow facts of the controversy before it, but rather with the formulation of broad rules to govern pension disputes. For example, the Supreme Court took care to note that the surplus run by Florida's retirement system, and its consequent ability to absorb the shock of a retroactive benefit award, did not justify such relief, reasoning that that happenstance "should not control a decision that must be based on a broad principle." 108 S.Ct. at 2363. Concluding this thought, the Court reiterated its concern that " '[i]mportant national goals [not] be frustrated by a regime of discretion' " that produced different results in different cases. *Id.* (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975)). Indeed, *Long* 's entire raison d'etre was to bring uniformity to this area of the law.

As for the particular issue at hand, the Supreme Court gave every indication that it was not merely fashioning a rule to govern the use of sex-based actuarial tables. At the very beginning of the opinion, the Court stated the questions presented not in terms of actuarial tables, but of "benefit structures" and of whether persons who retired before the liability date "are entitled to adjusted benefits to eliminate *any sex discrimination* for all future benefit payments." *Id.*, 108 S.Ct. at 2357 (emphasis supplied). The Court cautioned against applying a rule that "undermines the basic financial calculus of a pension plan that determines contribution rates to support a predicted level of payments." *Id.*, 108 S.Ct. at 2364. The Court pointed out that an actuarially funded plan relies on a number of "essential assumptions," such as "a past assessment of an employee's expected years of service, date of retirement, average final salary, and years of projected benefits." *Id.* And note, with regard to the facts of this case, that the rate at which beneficiaries earned credit toward their pension is an assessment of expected years of service. Finally, the Court stated its holding broadly: "[L]iability may not be imposed for pre-*Norris* conduct." *Id.*, 108 S.Ct. at 2359. *"Norris* informed covered employers with pension

plans of the obligation under Title VII to provide payment levels, both for contributions and for benefits, that are nondiscriminatory as to sex." *Id.* 108 S.Ct. at 2363.

■ The EEOC's Policy Statement reflects this liberal understanding of *Long.* Although a headnote describes the statement as addressing when the Commission would "challeng[e] the use of sex-based actuarial tables," the text of the statement belies this narrow description:

> In summary, where a charging party challenges *sex-based pension benefits,* the Commission's position is as follows [with respect to defined benefit plans]: ... If the charging party retired before August 1, 1983, he or she will be entitled to no relief because *no liability may be imposed for pre-*Norris *conduct.*

Pension Plan Guide (CCH) ¶ 23,783W, at 25,189–11. The Court's underscoring is to emphasize the Policy Statement's broad view.

The Court agrees that *Long* establishes August 1, 1983, as the relevant liability date. This in turn creates a difficulty for the EEOC's case, because Homola, the charging party, retired on February 1, 1983, and, in the words of the EEOC's Policy Statement, "he ... [is] entitled to no relief because no liability may be imposed for pre-*Norris* conduct." *Id.* Moreover, the EEOC has identified no other employees with service before July 2, 1965, who retired or will retire on or after August 1, 1983. Whether the charging party's ineligibility for relief is in itself fatal to the EEOC's case has not been briefed. However, because there have been disputes about the scope of discovery permitted to be taken, and because the Court is required to draw all reasonable inferences in favor of the nonmoving party, the Court will not grant summary judgment on this ground alone. Rather, for purposes of this analysis, the Court will assume the existence of male Bank employees with service before July 2, 1965, and who retired or will retire on or after August 1, 1983. The question then is whether these employees are entitled to pensions that do not take into account the sex-based crediting rates used before July 2, 1965.

■ The answer is that they are not. In *Norris,* the Court held that unisex actuarial tables need be used for the calculation of benefits only from the effective date of that decision. 463 U.S. at 1074–75, 103 S.Ct. at 3494 ("The Court holds ... that all retirement benefits derived from contributions made after the decision today must be calculated without regard to the sex of the beneficiary."); *id.* at 1107 n. 12, 103 S.Ct. at 3511 n. 12 ("[O]nly benefits derived from contributions collected after the effective date of the judgment need be calculated without regard to the sex of the employee."); *id.* at 1111, 103 S.Ct. at 3513 (O'Connor, J., concurring) ("For contributions collected before the effective date of our judgment ... I would allow employers and participating insurers to calculate the resulting benefits as they have in the past."). *Accord Norris v. Arizona Governing Committee,* 796 F.2d 1119, 1120–22 (9th Cir.1986) (on remand); *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 783 (9th Cir.), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986). *Long* reaffirmed this point of law (108 S.Ct. at 2364)—a detail recognized by the EEOC's Policy Statement:

> If the charging party retired after August 1, 1983, and the respondent immediately after *Norris* adopted unisex tables for all benefits derived from post-August 1, 1983 contributions, then the charging party will be entitled to no relief for the respondent's previous use of sex-based tables.

Pension Plan Guide (CCH) ¶ 23,783W, at 25,189–11. As the Policy Statement views *Long:* "Individuals who retired after August 1, 1983, generally have a right to receive sex-neutral benefits only to the extent that those benefits are derived from post-*Norris* contributions." *Id.* at 25,189–10.

The Court believes the latter statement to be the rule of law applicable here. There is no evidence that the Bank did not promptly comply with *Manhart* and *Norris,* and therefore it must calculate benefits

in a sex-neutral way only to the extent that they are derived from post-*Norris* contributions. Of course, the Bank goes beyond this minimum requirement by calculating all benefits in a sex-neutral way with respect to contributions made after July 2, 1965.

The EEOC's litigation counsel makes a handful of arguments in an attempt to distinguish *Long.* They may be dealt with briefly. Initially, the EEOC argues that the contributions made by the Bank on behalf of men "were *not* 'keyed' to lower benefit payments." Pl. Response, at 17. This assertion, unsupported by any evidence whatsoever, is directly contradicted by the affidavits of Donald Hoy, the Bank's employee benefits manager, and of Thomas H. Jolls, Jr., the Bank's former actuary; both have testified that the differential pension crediting rates for men and women are one of the factors that have gone into computing actuarially how much to contribute to the Bank's pension plan. Hoy Aff. ¶ 10; Jolls Aff. ¶ 5. The EEOC thus has failed to create a genuine issue of material fact on this point, and the Court must accept as true that an order of increased benefits that ignored the previous crediting assumptions would upset the actuarial foundations of the plan. *See* Jolls Aff. ¶¶ 5–9. Tinkering with these suppositions is just the sort of thing the Supreme Court forbade in *Long:* "We cannot recognize a principle of equitable relief that ignores the essential assumptions of an actuarially funded pension plan." 108 S.Ct. at 2364.

Next, the EEOC accuses the Bank of having "depleted the pension fund" by its decision in 1971 to return to employees their previous contributions (with interest). Pl. Response, at 19. This is a strange argument, because it does not "deplete" an adequate pension fund to return participants' contributions; instead, it shares with participants' the plan manager's investment success by allowing them to enjoy their defined pension benefits without a contemporaneous sacrifice. To hold this against the Bank would be the ultimate penalty for success. Compare *Long,* 108 S.Ct. at 2363, where the Supreme Court warned: "We will not adopt the premise that the appropriateness of a retroactive award turns on a particular fund's current financial status. . . . To do so imposes a penalty for prudent management." And that is all that need be said to the EEOC's later argument that "[t]he relief the EEOC seeks here ... does not threaten the security of Defendant's pension fund." Pl. Amended Surreply, at 2.

Last, the EEOC contends that the Bank's plan did not guarantee benefits prior to 1971, and that this means the principles of *Long* do not apply. But the focus of *Long,* and its concern for the solvency of pension funds, is on the effects of a court order on pension plans as they stand in the present. For the past twenty years, the Bank's plan has been a defined benefit plan. That is all that is needed for *Long* to apply.

A final punctuation mark. The EEOC has identified no decision that holds pension plan decisions made prior to the passage of Title VII may be cured retroactively. For its part, the Bank has cited two that reject such a proposition. *See Stuppiello v. ITT Avionics Division,* 575 F.2d 430, 433–34 (3d Cir.1978); *Rosen v. Public Service Electric and Gas Co.,* 477 F.2d 90, 96 (3d Cir.1973). Neither explains its conclusions in detail—leading the Bank to laud their rationale as instinctive and the EEOC to decry it as say-so. Both are, in any event, pre-*Manhart,* -*Norris* and -*Long.*

This Court has tried to spell out its reasoning more fully, but its conclusions may be simply stated: (1) Homola's charge was timely; (2) August 1, 1983, is the relevant liability date, and male employees who retired before then may not recover; and (3) any male employees who have retired or will retire after the relevant liability date may not recover an increased pension for service before July 2, 1965, because such relief would constitute an impermissibly retroactive application of Title VII.

### B. *Equal Pay Act*

■ Although the Court does not view the EPA and Title VII as walking in lock step (see, e.g., *Fallon v. State of Illinois,* 882 F.2d 1206, 1212–18 (7th Cir.1989)), it does conclude that the reasons forbidding

retroactive liability and relief under Title VII apply with equal force under the EPA. Truly, *Manhart, Norris* and *Long* would be wasted work if their principles could be gotten around by the simple invocation of the EPA. This might be acceptable if the two statutes had different goals, but they do not. Therefore, the Court holds, for the reasons stated above, that no relief is available to male employees under the EPA.

■ The Court also holds that female employees are not entitled to relief under the EPA on account of the Bank's reduction of their pension crediting rates in 1971. Assuming that the EPA applies to pensions and that the claim is timely, it is nevertheless an unreasonable construction of the statute to read it as prohibiting the elimination of a preferential early retirement age—which is what the Bank did by reducing the crediting rate to 2% from 2.5% for women, for the crediting rate is directly tied to the retirement age. The EEOC in effect argues that, by passing the EPA, Congress intended to freeze existing early retirement ages for women, and, what's more, to require employers to extend these early retirement ages to men. Or, alternatively, Congress intended to permit an elimination of early retirement ages, but cause a vast increase in the cost of funding pension plans by allowing employees to accumulate benefits as though the early retirement ages were still in effect. Of course, all of this was done without any express discussion that this is what Congress intended to accomplish by passing a statute that refers only to "wages" and "wage rate differential[s]." *See* 29 U.S.C. § 206(d). A Houdini-like feat of legerdemain indeed.

This counter-intuitive understanding of the EPA certainly was not evidenced by an opinion letter dealing with the subject of discriminatory retirement ages that was issued by the EEOC's General Counsel on September 13, 1968. *See* Def. 12(1) Statement ¶ 5 & Ex. 3. The letter notes that "a number of interested parties have asked whether Title VII permits a gradual adjustment of existing plans that provide for earlier option retirement of women." The letter then opines that "Title VII would permit such a gradual adjustment in this particular situation," because "immediate removal of the earlier retirement option would be unfair to women close to retirement." Thus, it would be "in keeping with the purposes of Title VII to permit gradual adjustment when plans are brought into compliance with Title VII." The letter then gives an example of a non-complying plan, and discusses how the earlier retirement age for women could be eliminated while retaining a transitional preference for women already close to retirement age. Nowhere does the letter suggest that an employer who eliminates early retirement for women—and thus reduces the rate at which they earned credit towards their pensions—thereby violates the EPA. In fact, had this been the original understanding of the EPA, the opinion letter would have been a positive encouragement for employers to violate its strictures. Moreover, according to the parties' submissions, the EEOC did not get around to expressly defining pension benefits as "wages" under the EPA until 1986. *Compare* 29 C.F.R. § 800.100 (1967) *with* 29 C.F.R. § 1620.11(f) (1986).

The Supreme Court has cautioned against ordering remedies that strike at the funding assumptions of pension plans absent an explicit statutory directive to do so. *See Long*, 108 S.Ct. at 2362. If the Court were to order the Bank to increase the pension funding rate for all employees to 2.5%, while retaining the current retirement ages, that is precisely what the Court would be doing. The EEOC nonetheless presses upon the Court the following syllogism: If pension benefits are wages, and if wages can't be lowered to end discrimination, then pension benefits cannot be lowered to end discrimination. It is a well-worn observation that law is about experience, not syllogisms. Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881). But in any event, the minor premise of the syllogism is erroneous with respect to the application of retroactive relief against defined-benefit plans. Here, it is the interpretation of the statute, or more precisely the lack of a congressional directive for

retroactive application, that is controlling. Without being given such an express statutory command, the Court believes the principles of *Manhart*, *Norris* and *Long* require denial of the relief sought under the EPA on behalf of the Bank's female employees. *Cf. Norris*, 463 U.S. at 1111 n. 4, 103 S.Ct. at 3513 n. 4 (O'Connor, J., concurring) (EPA does not appear to apply to retirement plans, but if it did, it "would not require that employers 'top up' benefits by using male-longevity tables for all workers.").

## CONCLUSION

Given the opinions stated in the EEOC's final Policy Statement, the Court cannot help but wonder why the agency has continued the prosecution of this case. Maybe there is a clue in the following chronology: April 18, 1983—Homola's charge filed; July 6, 1983—*Norris* decided; May 2, 1988 —this suit filed; June 22, 1988—*Long* decided; January 3, 1989—initial Policy Statement issued; July 3, 1989—final Policy Statement issued. The Court grants the defendant's motion for summary judgment and denies the plaintiff's cross-motion for summary judgment. Judgment will be entered in favor of defendant and against plaintiff.