In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3117

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff-Appellant,

v.

NORTH GIBSON SCHOOL CORPORATION,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 98 C 168--Larry J. McKinney, Chief Judge.

ARGUED FEBRUARY 14, 2001--DECIDED September 11, 2001


  Before POSNER, COFFEY and RIPPLE, Circuit
Judges.

  RIPPLE, Circuit Judge.  In December 1997,
the Equal Employment Opportunity
Commission ("EEOC") received charges of
age discrimination from two employees of
the North Gibson School Corporation
("NGSC"). The charges alleged that NGSC's
early retirement plan ("ERP")
discriminated on the basis of age in
violation of the Age Discrimination in
Employment Act, as amended, 29 U.S.C.
sec. 621 et seq. ("ADEA"). The EEOC filed
this action against NGSC in September
1998; it sought monetary and injunctive
relief against NGSC on behalf of a group
of seven former and current employees.
The district court dismissed the claims
for injunctive relief as moot and later
granted summary judgment to NGSC with
respect to the claims for monetary
relief. For the reasons set forth in the
following opinion, we affirm the judgment
of the district court.

I

BACKGROUND
A.  Facts

  In February or March 1997, Cathy Heck,
UniServ director for the Indiana State
Teachers Association and chief negotiator
for the North Gibson Education

Association, telephoned Sandra Nixon, the superintendent of NGSC. Heck had learned that a district court had held that the Crown Point Community School Corporation's early retirement plan discriminated against teachers and administrators on the basis of age. See EEOC v. Crown Point Comm. Sch. Corp., No. 2:93 CV 237, 1997 WL 54747 (N.D. Ind. Jan. 2, 1997). In her conversation with Nixon, Heck expressed concern that there also might be a problem with NGSC's ERP contained in the master contract ("Contract") that had been negotiated by NGSC and the North Gibson Education Association ("the Union") in 1995.

At the time of the Crown Point decision, NGSC's ERP was similar to the plan that had been rejected in Crown Point. The ERP originally had been adopted in 1988 and was amended in 1995, although the amendments left it virtually unchanged. To be eligible for early retirement benefits, an employee had to be at least fifty-five and not older than sixty-five years old on June 30 of the year of retirement, and he also must have completed at least fifteen years of service with NGSC by June 30 of the retirement year.[1]

On March 10, 1997, Heck wrote Nixon a letter suggesting that the ERP may no longer be appropriate and formally requesting that NGSC and the Union commence bargaining to rectify any problems with the ERP.[2] Nixon replied that, pursuant to Article IV of the Contract, NGSC believed it no longer was bound by the ERP because it had a good-faith belief that the ERP could be found to be in violation of the law.[3] In a letter written on March 20, 1997, Nixon also com-municated that the North Gibson School Board agreed to begin negotiating a new early retirement plan immediately.

The first negotiation meeting was held on May 29, 1997, and the ERP was terminated at that meeting. NGSC told the Union bargaining committee that NGSC would not permit anyone to retire under the ERP. NGSC and the Union also agreed to create a separately negotiated retirement plan for Noel Loftin, an employee who had expressed his wish to retire after NGSC decided no longer to honor the ERP. The Union and NGSC continued negotiations on several

subsequent occasions. NGSC adopted a new plan, modeled after Crown Point's revised plan, on February 25, 1998, and the new plan was ratified by the Union on March 9, 1998.

On December 29, 1997, two teachers, Fred Anthis and Lewis Schleter, filed charges of age discrimination against NGSC with the EEOC. The charges alleged that "[t]he contract for Teachers and Administrators provides that older retirees receive a lesser percentage of their salaries for their retirement pay, and that they receive the retirement pay for a lesser number of years than the younger retirees do." R.15, Nixon Aff., Ex.1 at 2 & Ex.2 at 2. In the charges, neither Anthis nor Schleter claimed that he had retired under the ERP. Both were employed with NGSC at the time they filed the charges of discrimination.

Anthis and Schleter each claim that they would have retired in 1995 but for the discriminatory nature of the ERP that was in effect at that time. In 1994 or 1995, Anthis and Schleter discussed together that the ERP was discriminatory because they were sixty years old, but they claim that they did not realize they could file charges of discrimination. At that time, neither notified NGSC or the Union that he intended or wished to retire. Anthis and Schleter were aware, in March 1997, that NGSC and the Union were negotiating a new early retirement plan. They filed charges with the EEOC in December 1997 only after they learned of the Crown Point decision in August 1997.

After receiving the charges that Anthis and Schleter had filed against NGSC, the EEOC sent a "Notice of Charge of Discrimination" to Nixon in early January 1998. Id., Ex.1 at 1 & Ex.2 at 1. After NGSC responded to the charges, both parties proposed conciliation agreements that were rejected by the other party. On July 20, 1998, the EEOC notified NGSC that it would make no further efforts at conciliation.

B.  Proceedings in the District Court

On September 3, 1998, the EEOC filed a complaint with the district court in which it alleged that NGSC had engaged in unlawful employment practices in violation of the ADEA by discriminating

against employees age fifty-six and older through its ERP. In its prayer for relief, the EEOC requested both monetary damages and permanent injunctive relief for a group of individuals who suffered discrimination under NGSC's ERP./4 The group of individu-als consisted of seven employees, including Anthis and Schleter. The other five employees retired prior to the ERP's termination, but none of the five filed a grievance or charges with NGSC, the Union, or the EEOC.

NGSC filed a motion to dismiss all of the EEOC's claims under Federal Rules of Civil Procedure 12(b)(1) and (6), which the district court denied in part and granted in part. The district court denied the motion to dismiss the claims for monetary damages, suggesting that a motion for summary judgment would be a more appropriate procedural vehicle for addressing those claims.

With respect to the claims for injunctive relief, the district court granted NGSC's motion to dismiss. The court reasoned that the EEOC's request for an injunction restraining discriminatory policies and practices was moot because the allegedly discriminatory ERP had been discontinued in May 1997, and the EEOC had no reasonable expectation that a discriminatory plan would be reinstated./5

The district court later granted NGSC's motion for summary judgment on the EEOC's claims for monetary relief. The court held that the EEOC must base a claim for individual monetary relief on a timely, individual charge of discrimination. The court reasoned that the EEOC was in privity with the individuals for whom it sought relief; if the individuals were time-barred from bringing the claims, the EEOC also was barred from bringing the claims. The court acknowledged that the EEOC's right to sue in its own name is independent of an individual's right to sue and that the EEOC's role in preventing employment discrimination serves a public interest broader than that of an individual. However, the court believed that the public interest served by the EEOC's suit for compensation for individual teachers was minimal and did not outweigh the need to conform to the statutory time limits established for individual claims./6

Turning to the circumstances of this case, the court determined that none of the employees had filed timely charges that could serve as a basis for the EEOC's claim because five of the employees never filed charges and Anthis' and Schleter's charges were untimely.

II

DISCUSSION

A.  Monetary Relief

We review the district court's decision to grant summary judgment de novo. See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). To determine whether a genuine issue of material fact exists, we must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The EEOC submits that the district court improperly granted summary judgment to NGSC on the claims for monetary relief on behalf of the seven employees. The EEOC contends that it has independent authority to file suit under the ADEA to recover damages on behalf of individual employees, and it is therefore irrelevant whether any of the teachers in this case filed timely charges. Alternatively, the EEOC argues that a reasonable jury could have found that Anthis' and Schleter's charges were timely, and, as a result, the other five employees could have piggybacked their claims onto Anthis' and Schleter's claims. We examine each argument in turn.

1.  Timely Charges as a Basis for the EEOC's Suit

Under the ADEA, the EEOC has the power to investigate violations, to sue on behalf of aggrieved individuals, and to institute injunctive proceedings. See 29 U.S.C. sec.sec. 626(a) & (b). In EEOC v.

United States Steel Corp., 921 F.2d 489, 496 (3d Cir. 1990), our colleagues in the Third Circuit noted that this power encompasses two distinct roles-- vindicating specific private claims and protecting the public interest. When the EEOC "seeks individualized benefits under the ADEA for particular grievants, . . . the Commission functions to that extent as their representative." U.S. Steel, 921 F.2d at 496. Consequently, courts have held that the EEOC is precluded from seeking monetary relief for individuals who are barred from seeking the same relief themselves because their claims have been adjudicated or are subject to arbitration agreements./7 See EEOC v. Harris Chernin, Inc., 10 F.3d 1286, 1291 (7th Cir. 1993) (holding that the EEOC's claim for individual monetary relief was barred by res judicata because the individual on whose behalf the EEOC brought suit previously had been dismissed for failure to file a timely charge of discrimination); see also EEOC v. Kidder, Peabody & Co., 156 F.3d 298, 300-01 (2d Cir. 1998) (holding that the EEOC's claim for individual monetary relief was precluded by a prior arbitration agreement between the employee and the employer); U.S. Steel, 921 F.2d at 496-97 (holding that the EEOC's claim for individual monetary relief was barred by res judicata).

   In these cases, we, along with the Second and Third Circuits, have emphasized the distinctive enforcement scheme of the ADEA, which places the EEOC in privity with the individual for whom it seeks relief. Under the statute, the EEOC steps into the shoes of the individual because "the right of any person to bring such action shall terminate upon the commencement of an action by the Equal Employment Opportunity Commission to enforce the right of such employee under [the ADEA]." 29 U.S.C. sec. 626(c)(1); see also Kidder, 156 F.3d at 302; Harris Chernin, 10 F.3d at 1291; U.S. Steel, 921 F.2d at 494. As the Third Circuit has noted, in this respect, the drafters of the ADEA consciously departed from the enforcement scheme of Title VII, which does not terminate the rights of the employee once the EEOC has brought suit. See U.S. Steel, 921 F.2d at 494 n.4. Indeed, in U.S. Steel, the Third Circuit suggested that Congress would have preserved the

individual's right to bring a complaint in some other fashion if it had not believed that the EEOC would represent the interests of the individual. See id. at 495. It is this privity, created by the ADEA's distinctive enforcement scheme, that precludes the EEOC from seeking monetary relief that is not available to the individual.

In Harris Chernin, we held that the EEOC could not seek back pay, liquidated damages, and reinstatement under the ADEA on behalf of an employee whose individual claim already had been adjudicated. See Harris Chernin, 10 F.3d at 1291. Prior to the EEOC's suit, the employee had filed a complaint that was dismissed by the district court on summary judgment because the claim was barred by the statute of limitations in effect at that time. See id. at 1288. We held that the EEOC, because it was the employee's representative, was barred by res judicata from subsequently seeking monetary relief on his behalf. See id. at 1291. We adopted the Third Circuit's reasoning in U.S. Steel that, "'if a person first litigates in his own behalf, that person may be precluded from claiming any of the benefits of a judgment in a subsequent action that is brought or defended by a party representing him.'" Id. (quoting U.S. Steel, 921 F.2d at 493). Because we accepted the Third Circuit's determination that there is privity between the EEOC and individuals for whom it seeks individual benefits, we held that individuals were precluded from obtaining individualized relief in a subsequent EEOC action based on the same claims. See id. at 1290-91; see also U.S. Steel, 921 F.2d at 496.

In Kidder, the EEOC sought back pay and liquidated damages on behalf of nine employees. See Kidder, 156 F.3d at 300. The Second Circuit held that, under the ADEA, the EEOC was barred from bringing an action for monetary relief on behalf of an individual who had signed a binding arbitration agreement with the employer. See id. at 300-01. The court also relied on the distinctive enforcement scheme of the ADEA and noted that "circuit courts have uniformly held that the EEOC may not seek monetary relief in the name of an employee who has waived, settled, or previously litigated the claim." Id. at

301.

In contrast, the same courts recognize the EEOC's right to pursue injunctive relief to vindicate broader concerns affecting the public interest. In making this distinction, the courts have distinguished claims for injunctive relief from those for individual monetary damages by contrasting the high level of public interest served when the EEOC seeks an injunction with the minimal public interest served by an individual monetary award. When the EEOC sues on its own behalf to obtain an injunction that prohibits discrimination, it promotes the public interest because its "interests are broader than those of the individuals injured by discrimination." Harris Chernin, 10 F.3d at 1291. "'[T]he ADEA is designed not only to address individual grievances, but also to further important social policies' such as deterrence of employment discrimination and prevention of future discrimination through class-wide relief." Kidder, 156 F.3d at 302 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 27 (1991)).

Our reasoning in Harris Chernin, shared by our sister circuits in the cases that we just have discussed, is applicable to the situation before us. An individual must have filed timely charges of discrimination with the EEOC in order to file a claim of discrimination himself. See 29 U.S.C. sec. 626(d). Despite this filing requirement, the EEOC asks us to hold that it may bring suit for monetary damages even when none of the individuals on whose behalf it sues have filed timely charges. Because of the distinctive enforcement scheme of the ADEA, however, the EEOC is in privity with the NGSC teachers, and it represents their interests in this claim for monetary relief. As their representative, the EEOC is barred from seeking individual benefits that the employees would be unable to pursue on their own.

Although the EEOC's suit against NGSC is not barred by res judicata, as the suit in Harris Chernin was, the circumstances in Harris Chernin nevertheless support the decision we reach today. Procedurally, the employee in HarrisChernin took a step that the seven individuals represented by the EEOC here did not take--the employee brought suit

on his own prior to being represented by the EEOC. However, five of the NGSC teachers never filed charges of discrimination, and, as we will discuss in the next section, the charges filed by the remaining two teachers were untimely. If any of the individuals from NGSC had attempted to bring suit in the district court based on untimely or nonexistent charges, the claim would have been dismissed by the district court for a failure to comply with the statutory filing requirement. At that point, the seven would be in the same position as the employee in Harris Chernin, and the prohibition Harris Chernin placed on the EEOC's subsequent relitigation of the same claims would apply squarely.

## 2. The Timeliness of Anthis' and Schleter's Charges

Because the EEOC does not have independent authority to bring claims for monetary relief, it may only maintain its suit for damages if it can establish that a charge of discrimination was filed timely. Anthis and Schleter were the only NGSC employees who filed charges. They filed those charges on December 29, 1997. Because Indiana is a non-deferral state for purposes of establishing the statutory period within which an employee must file charges of age discrimination, see Daugherity v. Traylor Bros., Inc., 970 F.2d 348, 350 n.2 (7th Cir. 1992), Anthis' and Schleter's charges had to be filed within 180 days of the unlawful employment practice, see 29 U.S.C. sec. 626(d)(1). This 180-day period began on July 2, 1997, and the EEOC must demonstrate that a discriminatory act occurred subsequent to that time.

As early as 1994 or 1995, Anthis and Schleter were on notice that the ERP discriminated against them. Around that time, they discussed the fact that they, being sixty years old, would receive lower early retirement benefits than a fifty-five-year-old teacher with the same number of years of service. However, neither indicated to NGSC that he was considering retirement nor did either file charges with the EEOC. The ERP was terminated by NGSC at the May 29, 1997 negotiation meeting between NGSC and the Union. Based on this information alone, it appears that the discriminatory acts

occurred before the 180-day period and that the charges therefore were untimely.

Nevertheless, under the "continuing violation" doctrine, the EEOC may "'get relief for a time-barred act by linking it with an act that is within the limitations period.'" Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1003 (7th Cir. 2000) (quoting Speer v. Rand McNally, 123 F.3d 658, 663 (7th Cir. 1997)). A continuing violation may exist when the employer has an express, openly espoused, discriminatory policy that was in effect during the limitations period. See Place v. Abbott Labs., 215 F.3d 803, 808 (7th Cir. 2000), cert. denied, 121 S. Ct. 768 (2001); Stewart v. CPC Int'l, Inc., 679 F.2d 117, 121 (7th Cir. 1982). However, the continuing violation doctrine does not apply when a time-barred incident cannot be linked with an incident that occurred within the statutory period or when the time-barred incident alone should have triggered the plaintiff's awareness that his rights had been violated. See Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 875-76 n.1 (7th Cir. 1999).

The Supreme Court has explained that a facially discriminatory policy discriminates each time that it is applied. See Lorance v. AT&T Techs., Inc., 490 U.S. 900, 912 & n.5 (1989)./8 The Court also has made clear, though, that the "proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980) (emphasis in original) (quotation marks and citation omitted) (holding that the limitations period on the plaintiff's discrimination claim began to run from the time he was given notice that he would not receive tenure, not from the time he actually was terminated); see also Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (per curiam) (holding that the limitations period began to run from the time the plaintiffs were given notice of their termination, even though the plaintiffs continued to work after that date). We have held that, in the context of mandatory retirement programs, the statute of limitations runs from the date the employee is given notice that he will be forced to retire upon reaching a certain age, despite the fact that the

employee is not taken off the payroll until some time after the notification date. See Heiar v. Crawford County, 746 F.2d 1190, 1194 (7th Cir. 1984) (as amended); see also Kuemmerlein v. Bd. of Ed. of the Madison Metro. Sch. Dist., 894 F.2d 257, 259-60 (7th Cir. 1990) (holding that the statute of limitations begins to run on the date on which the plaintiffs received notice of their termination, not on their actual termination date); Mull v. Arco Durethene Plastics, Inc., 784 F.2d 284, 290 (7th Cir. 1986) ("[T]he significant date for purposes of Ricks and the limitations period is that date upon which the employee receives notice of termination and not the date upon which the termination becomes effective."). The reasoning underlying this principle is that the employee is aware that he has been discriminated against at the time the employer makes clear to him that he will be subjected to the discriminatory policy. The employee's eventual termination at a later date is an inevitable consequence of the discriminatory decision to terminate him; it is not in itself a separate discriminatory act. See Ricks, 449 U.S. at 257-58. Indeed, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." Id. at 257; cf. Florida v. Long, 487 U.S. 223, 239 (1988) ("It is not correct to consider payments of [pension] benefits based on a retirement that has already occurred as a sort of continuing violation.").

Without addressing this body of case law or providing support for its own proposition, the EEOC asserts that the retirement of David Specht on August 1, 1997, constitutes a discriminatory application of the ERP within the limitations period sufficient to satisfy the requirements of the continuing violation doctrine. Specht submitted a formal letter of intent to retire on March 31, 1997. He retired on August 1, 1997, after teaching through the end of the summer school session. Based on Specht's payments, it appears that his benefits had been calculated under the ERP. He received his first payment on October 1, 1997.

The precedent we have just discussed establishes that, with respect to

retirement plans, the discriminatory act occurs on the date on which it becomes clear that the employee will retire pursuant to the terms of the discriminatory plan, regardless of whether he continues to work past that date. Cf. Mogley v. Chicago Title Ins. Co., 719 F.2d 289, 290 (8th Cir. 1983) (per curiam) (holding that the limitations period began to run from the time the employee received a letter notifying him that he could accept early retirement rather than face termination, even though his retirement was not effective until seven months later). Notably, the EEOC has offered no evidence to indicate that an employee's last day of employment has any effect whatsoever on the application of the ERP or the calculation of the employee's benefits. Cf. Long, 487 U.S. at 239 (holding that, in the pension fund context, the discriminatory act is the calculation of benefits fixed under a contract between the employer and retiree and that each payment of benefits did not constitute a continuing violation). Indeed, the evidence of record, including the testimony of Heck and Nixon, as well as various documents, suggests the contrary.

According to the terms of the ERP, a teacher electing to take early retirement had to notify NGSC of his "intent to claim the early retirement benefit no later than June 1 of the school year preceding the year" he wished to begin receiving benefits. R.149, Ex.6 at 41. Specht provided this notification in March 1997 when he gave Nixon his letter expressing his intent to retire under the ERP. At that time, Specht was on notice that he was retiring pursuant to the discriminatory ERP and that the amount of his benefits would be less than those of younger retirees. It was on this date that the discriminatory act occurred, and Specht's subsequent retirement in August was merely an inevitable consequence of that act. Thus, Specht's August retirement does not establish that the ERP was applied in August, and it does not support a continuing violation.

The EEOC offers the retirement of one other teacher, Noel Loftin, in its attempt to establish a continuing violation. However, the EEOC's argument with respect to Loftin is more flawed than its argument concerning Specht. In

early May 1997, Loftin expressed to Nixon his intent to retire and was told that NGSC was not accepting retirements at that time. During subsequent phone conversations and at the May 29, 1997 meeting, Nixon and Heck discussed the need "to create some kind of a retirement plan for [Loftin] that was not the current contract." R.148 at 26 (quotation marks omitted). During May and June 1997, Loftin and NGSC negotiated an individualized early retirement agreement, and, on June 19, 1997, Loftin tendered his resignation. On June 24, 1997, Loftin accepted an early retirement benefit package of $64,958.16 (he would have received $64,958.15 under the ERP), and, on June 30, 1997, he retired. Like Specht, he received his first payment on October 1, 1997.

Although the EEOC contends that Loftin's retirement extended the application of the ERP into the limitations period, its argument fails because Loftin's benefits were calculated under a separately negotiated agreement in June 1997. Loftin's final benefits package was only one cent greater than the benefits package he would have received under the ERP; however, the EEOC has offered no evidence to suggest that age was indeed a factor in determining Loftin's early retirement benefits, as it would have been under the discriminatory ERP. In addition, all of the negotiations, including Loftin's acceptance of the benefits agreement, took place prior to July 2, 1997. Thus, there is no evidence to suggest either that Loftin's retirement occurred under the ERP or that he retired within the relevant statutory period.

This record will not support a determination that either Specht or Loftin retired under the ERP within the limitations period. Therefore, the EEOC is unable to demonstrate that there was a continuing violation that would render Anthis' and Schleter's charges timely. Because no other teacher filed charges, the EEOC has no timely filed charge on which to base its claims for monetary damages./9 Conse-quently, the district court correctly granted summary judgment for NGSC on those claims.

B. Injunctive Relief

The EEOC submits that the district court erred when it granted NGSC's motion to dismiss the claims for injunctive relief sought on Anthis' and Schleter's behalf. The EEOC recognizes that the ERP is no longer in effect, but it contends that its claims are not moot because Anthis and Schleter are not receiving the early retirement benefits they would have received but for the ERP. The EEOC contends that, under the ADEA, 29 U.S.C. sec. 626(b) (incorporating 29 U.S.C. sec. 217), the district court has the express authority to enjoin NGSC from withholding retirement benefits that Anthis and Schleter could have received absent a violation of the ADEA.

We believe that the district court correctly dismissed the EEOC's claim for injunctive relief against the "continued withholding of amounts owing" to Anthis and Schleter. R.1 at 3-4. As we already have discussed, we recognize that the EEOC can pursue broad injunctive relief even when it is barred from seeking individual monetary damages. See Harris Chernin, 10 F.3d at 1291. However, in the cases in which this injunctive relief was allowed, the EEOC was seeking broad, class-wide, prospective injunctions. The EEOC's "interests in determining the legality of specific conduct and in deterring future violations are distinct from the employee's interest in a personal remedy." Goodyear, 813 F.2d 1539, 1542 (9th Cir. 1987). In Kidder, the EEOC was not barred from seeking injunctive relief that furthered "'important social policies' such as deterrence of employment discrimination and prevention of future discrimination through class-wide relief." Kidder, 156 F.3d 302 (quoting Gilmer, 500 U.S. at 27). Similarly, we allowed the EEOC to seek an injunction that would enjoin the employer from "engaging in any employment practice which discriminates because of age," even when the EEOC could not pursue monetary relief for the employee. Harris Chernin, 10 F.3d at 1291 (quotation marks omitted). The Third Circuit recognized that, in contrast with the minimal public interest served by an individual suit, the EEOC protects "a broader interest by seeking to enjoin discrimination affecting an entire class." U.S. Steel, 921 F.2d at 496. The Ninth Circuit noted that the EEOC, when seeking to enjoin the employer from "future discrimination or

retaliation" against its employees, "'promotes public policy and seeks to vindicate rights belonging to the United States as sovereign.'" Goodyear, 813 F.2d at 1543 (emphasis in original) (quoting EEOC v. Occidental Life Ins. Co., 535 F.2d 533, 537 (9th Cir. 1976)).

Notably, the same courts that have confirmed the right of the EEOC to seek broad injunctive relief explicitly have disallowed an award of back pay to the individuals who could not have sought that relief themselves. See Kidder, 156 F.3d at 302 (holding that the public interest in back pay is minimal when an individual has "freely contracted away, waived or unsuccessfully litigated a claim"); Harris Chernin, 10 F.3d at 1291 (holding that the EEOC is barred from re covering back pay for an employee who already litigated his claim); Goodyear, 813 F.2d at 1543 (holding that the EEOC's claim for individual back pay was on "different footing" than its claims for injunctive relief and that the claim was moot because the employee had contracted away her right to back pay). In the present case, the retirement benefits the EEOC seeks to obtain through injunctive relief for Anthis and Schleter serve the same function as an award of back pay. The same considerations obtain whether the EEOC seeks this relief through monetary damages or through an injunction. We see no reason, and the EEOC has offered none, why the EEOC should be able to obtain through an injunction what the courts have refused to grant it directly. The district court is empowered to grant the relief sought by the EEOC under 29 U.S.C. sec. 217, a provision of the Fair Labor Standards Act, which is incorporated by reference into the ADEA under 29 U.S.C. sec. 626(b). However, in order to give effect to the structure of the ADEA as enacted by Congress, we must look to the ADEA in its entirety in order to interpret the incorporation of sec. 217. See United States v. Cleveland Indians Baseball Co., 121 S. Ct. 1433, 1443 (2001) ("It is, of course, true that statutory construction is a holistic endeavor and that the meaning of a provision is clarified by the remainder of the statutory scheme . . . [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (quotation marks omitted)). The

ADEA requires individual charges of discrimination and provides statutory periods for filing the charges. The distinctive enforcement scheme of the ADEA prohibits the EEOC from obtaining monetary relief for individuals who cannot obtain that relief themselves because they have not filed timely charges. Thus, we cannot interpret the provision of the ADEA that authorizes injunctive relief in such a way as to allow the EEOC to avoid that prohibition by obtaining the same relief in the form of an injunction.

Finally, we also believe that the district court correctly dismissed as moot any claim the EEOC brought for broad injunctive relief to enjoin the future use of a discriminatory early retirement plan by NGSC. The EEOC has not identified a currently discriminatory plan nor has the EEOC suggested that it has a reasonable expectation that a discriminatory plan will be adopted by NGSC in the future. See City of Erie v. Pap's A. M., 529 U.S. 277, 287 (2000); United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).

The district court properly granted NGSC's motion to dismiss the EEOC's claims for injunctive relief./10

Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED

FOOTNOTES

/1 The benefits were calculated by multiplying three factors: the number of years of service (a maximum of twenty), a percentage taken from a chart in the ERP, and the starting salary for a teacher with a master's degree in the year of retirement. The percentage in the equation was assigned according to the year of retirement and the age of the teacher at the time of retirement. For example, in the first year of retirement, the assigned percentage was 2.5 for a fifty-five year old, 1.5 for a fifty-nine year old, and 1 for a sixty-four year old. As a result, the amount of yearly benefits decreased as the teacher's age increased. In addition, early retirement benefits were paid for a maximum of ten years. A fifty-five year old would receive ten years of bene-

fits, but a sixty-four year old would receive only one year of benefits. Consequently, the ERP provided lower benefits to older employees because of their age.

/2 In her deposition, Heck stated that she held this belief because her supervisor had notified her of the decision in Crown Point. She then reviewed the early retirement plans of the school districts she monitored, and, because NGSC's ERP was so similar to Crown Point's, she wrote to Nixon to suggest that a new ERP should be negotiated.

/3 Article IV, Part A of the Contract provides that, "[r]egardless of any other provision of this agreement or any supplemental agreement, the Board shall not be required to incur any financial obligations which it may hereafter, in good faith, find or determine to be contrary to law; and neither party shall be bound by any provision of this agreement which it may hereafter, in good faith, determine or find to be contrary to law." R.149, Ex.6 at 6.

/4 In its prayer for relief, the EEOC requested that the court:

A. Grant a permanent injunction enjoining [NGSC] from engaging in any employment practice which discriminates on the basis of age against individuals 40 years of age and older.

B. Order [NGSC] to institute and carry out policies, practices and programs which provide equal employment opportunities for individuals 40 years of age and older, and which eradicate the effects of its past and present unlawful employment practices.

C. Order [NGSC] to make whole those individuals whose early retirement benefits were or are being unlawfully withheld as a result of the acts complained of above, by restraining the continued withholding of amounts owing, with prejudgment interest, in amounts to be determined at trial.

D. Order [NGSC] to make whole all individuals adversely affected by the unlawful practices described above, by providing the affirmative relief necessary to eradicate the effects of its unlawful practices.

R.1 at 3-4.

/5 The court also noted that, under 29 U.S.C. sec. 626(b), it had the authority to "order the restraint of the continued withholding of the amounts due" to the employees if and when the EEOC proved the alleged discrimination. R.59 at 12. However, the court distinguished this statutory remedy from injunctive relief and held that

the remedy under sec. 626(b) did not necessitate an injunction. In the district court's view, the statutory remedy available under sec. 626(b) rendered the EEOC's separate request for an injunction unnecessary and moot.

/6 The district court further determined that the public interest in a monetary recovery was minimal because (1) the damages would be awarded directly to the teachers, (2) NGSC already had abandoned the discriminatory ERP, (3) NGSC understood the need to remedy discrimination and already had adopted an apparently nondiscriminatory plan, (4) the deterrent effect would be minimal because two other early retirement plans recently had been held in violation of the ADEA, and (5) the financial cost imposed on local taxpayers undermined the beneficial impact on the public interest.

/7 In cases brought under Title VII and the Americans with Disabilities Act ("ADA"), the EEOC also is precluded from seeking monetary relief for individuals who themselves are barred from bringing the same suit because, in such circumstances, the EEOC's suit serves only a minimal public interest. See, e.g., EEOC v. Waffle House, Inc., 193 F.3d 805, 812-13 (4th Cir. 1999) ("When the EEOC seeks 'make-whole' relief for a charging party, the federal policy favoring enforcement of private arbitration agreements outweighs the EEOC's right to proceed in federal court because in that circumstance, the EEOC's public interest is minimal, as the EEOC seeks primarily to vindicate private, rather than public, interests."), cert. granted, 68 U.S.L.W. 3726, 69 U.S.L.W. 3624, 3628 (U.S. Mar. 26, 2001) (No. 99-1823); EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539, 1543 (9th Cir. 1987) (holding that the EEOC's claim on behalf of an individual is moot under Title VII when the individual has settled the claim because the public interest in a back pay award is minimal); EEOC v. Kimberly-Clark Corp., 511 F.2d 1352, 1361 (6th Cir. 1975) (suggesting that a prior settlement may limit the scope of the relief that the EEOC may seek for the private benefit of individuals under Title VII).

In the specific context of arbitration agreements, the Sixth Circuit created a split in the circuits when it held that the EEOC is not barred by a preexisting arbitration agreement from seeking monetary relief on behalf of an individual. Compare EEOC v. Frank's Nursery & Crafts, Inc., 177 F.3d 448, 462 (6th Cir. 1999), with Waffle House, 193 F.3d at 813 (holding that an arbitration agreement precluded the EEOC from pursuing individual monetary relief in an ADA case), and EEOC v. Kidder, Peabody & Co., 156 F.3d 298, 300-01 (2d Cir. 1998) (holding that "an

arbitration agreement between an employer and employee precludes the EEOC from seeking purely monetary relief for the employee under the ADEA in federal court"). The Supreme Court has granted certiorari in Waffle House.

/8 Lorance involved a Title VII challenge to an allegedly discriminatory seniority system. "Although Lorance's specific holding has been abrogated by statute--42 U.S.C. sec. 2000e-5(e)(2) now gives employees injured by the application of a seniority system which has been adopted for an intentionally discriminatory purpose in violation of Title VII the option of measuring the limitations period from the date of that application-- its reasoning remains persuasive outside of the Title VII/intentionally discriminatory seniority system context." Huels v. Exxon Coal USA, Inc., 121 F.3d 1047, 1050 n.1 (7th Cir. 1997) (quotation marks omitted).

/9 As a result of our conclusion, the EEOC's "piggybacking" argument is moot. Piggybacking occurs when individuals who have not filed charges or who have filed untimely charges of discrimination join an action in which at least one individual has filed a timely charge that alleged class-wide discrimination or that claimed to represent a class of employees. See Anderson v. Montgomery Ward & Co., 852 F.2d 1008, 1017 (7th Cir. 1988). Assuming that piggybacking is appropriate in a case brought by the EEOC, as opposed to a private individual, see EEOC v. Ky. State Police Dep't, 80 F.3d 1086, 1095 (6th Cir. 1996); EEOC v. Wilson Metal Casket Co., 24 F.3d 836, 839-40 (6th Cir. 1994), because Anthis' and Schleter's charges were untimely, there are no charges onto which the EEOC could piggyback the claims of the remaining five teachers.

/10 In addition to arguing that the EEOC is precluded from bringing suit because the individuals it represents are barred from doing so, NGSC raises two alternative arguments. Both arguments fail.

  First, NGSC asserts the doctrine of laches. However, NGSC fails to raise a question of material fact as to whether it has been materially prejudiced by the alleged delay. See Jeffries v. Chicago Transit Auth., 770 F.2d 676, 679 (7th Cir. 1985).

  Second, NGSC claims that it is entitled to Eleventh Amendment sovereign immunity pursuant to Kimel v. Florida Board of Regents, 528 U.S. 62 (2000). However, NGSC is not an arm of the state government and therefore is not entitled to Eleventh Amendment immunity. See Alden v. Maine, 527 U.S. 706, 756 (1999).